PRESENT: All the Justices

TITAN AMERICA, LLC, ET AL.

v.  Record No. 012554     OPINION BY JUSTICE ELIZABETH B. LACY
                                    September 13, 2002
RIVERTON INVESTMENT
CORPORATION, ET AL.

FROM THE CIRCUIT COURT OF FREDERICK COUNTY
John E. Wetsel, Jr., Judge

In 1998 the appellant, Titan America, LLC, the successor to

Carolinas Cement Company, G.P., t/a Roanoke Cement Company,

(Titan)* sought to acquire land in Warren County to use as a

warehousing and distribution site for its cement business.  The

appellees, Riverton Investment Corporation, Capitol Cement

Corporation, and Riverton Corporation (collectively "Riverton"),

a competing cement company and its affiliates, opposed Titan's

plans by appearing before the local governing bodies including

the board of zoning appeals and planning commission, initiating

litigation in circuit court, and funding litigation undertaken

by various Warren County residents.

While Titan ultimately secured the necessary land and

permits to complete its project, Titan filed a motion for

judgment against Riverton in October 1999 asserting, inter alia,

claims of tortious interference with existing and potential

_____

        * The other appellants, Titan Atlantic Cement Industrial and
Commercial Company, S.A., Inc. and Tarmac Cement, Inc. were
general partners of the Carolinas Cement Company, G.P. and
remain members of Titan America, LLC.

economic relationships, conspiracy, and defamation based on the litigation filed or funded by Riverton.  Following consideration of Riverton's demurrers, motion for partial summary judgment, and motions for stay of discovery relating to Titan's original and amended motions for judgment, the trial court ultimately entered judgment in favor of Riverton, holding that under the Noerr-Pennington doctrine none of the complained of litigation was objectively baseless, that discovery was not required, and that the alleged defamatory statements were made in the course of litigation and therefore were absolutely privileged.  For the reasons that follow, we will affirm the judgment of the trial court.

### FACTS

#### A.  Underlying Proceedings

Titan originally sought to build its Warren County distribution facility on a site that it leased from Potomac Edison Company d/b/a Allegheny Power (Potomac Edison), but later purchased a site for the facility from the Economic Development Authority of Warren County and the town of Front Royal (EDA). The underlying litigation that forms the basis of Titan's motion for judgment in this case involved both sites.  Riverton recruited the individual litigants involved in this litigation, Ramona Bowden, Carol and Benjamin Weddle, and Tommy R. and Joyce S. Fritts, and provided legal representation for them.  Although

Titan filed this action in Frederick County, on the recusal of the circuit court judge of Frederick County, the matter was heard by Judge John E. Wetsel, Jr.  Judge Wetsel also heard all of the underlying proceedings at issue in this case.  We recite the facts in relation to each of the proposed development sites.

### 1.  Potomac Edison Site

In February 1999, Titan applied for a by-right use permit for its distribution facility on a site it leased from Potomac Edison.  The deputy zoning administrator approved the by-right permit in March 1999.  The following month Bowden and the Weddles appealed the administrator's decision to the Warren County Board of Zoning Appeals (BZA), asserting that the facility did not qualify as a by-right use and that the access road to the site could not be used for industrial purposes because it traversed agricultural land.  After two public hearings, the BZA reversed the decision of the zoning administrator and also held that the existing road could be used for industrial purposes, but that Titan could not construct a new road through the agricultural area to service the industrial portion of the property.

Titan appealed the BZA's decision to deny the by-right permit to the circuit court.  Bowden and the Weddles intervened in Titan's suit and also filed a separate appeal of the BZA's decision on the access road issue.  In August 1999, the circuit

3

court entered an order reversing the decision of the BZA, holding that Titan was entitled to the by-right permit and that the BZA erred in determining that Titan had a grandfathered right to use the access road for industrial purposes.

While the BZA was considering the access road issue on remand from the circuit court, Titan and Potomac Edison filed an application for a variance to allow industrial use of the access road. The BZA denied the variance and made a finding strictly limiting Titan's grandfathered non-conforming use of the access road. Titan and Potomac Edison appealed those decisions to the circuit court, which upheld the BZA's determinations.

Titan filed a petition for appeal with this Court regarding the use of the access road, which was refused. This Court awarded Bowden and the Weddles an appeal on the by-right permit issue, but dismissed the appeal as moot in June 2000 because Titan terminated the Potomac Edison lease and abandoned its plans to develop that site.

## 2. EDA Site

In the spring and summer of 1999, Titan began to consider other sites for its facility, including a site owned by EDA at the Kelley Industrial Park in Warren County. EDA voted to approve the sale to Titan on September 3, 1999. On September 13, Riverton filed a petition for mandamus against the EDA, alleging that the EDA violated Code § 2.1-343 of the Virginia

4

Freedom of Information Act by not giving proper notice of its intention to vote on the sale of the land. Riverton also sought a declaratory judgment and injunction against the sale of the site to Titan asserting that the sale was contrary to the criteria established by statute and EDA rules for such a sale. EDA settled this action by agreeing to comply with the provisions of the Virginia Freedom of Information Act and to vote again on the sale of the land on October 15.

On September 27, 1999, EDA informed Riverton that it had rescheduled the vote for October 7 and Riverton filed another action against EDA to enforce the settlement agreement reached in the prior mandamus proceeding. The circuit court entered a decree enjoining EDA from voting on the sale of the land to Titan before October 15.

EDA set November 12 as the date for the vote on the sale of the land. Riverton and the Fritts filed a complaint seeking a declaratory judgment and an injunction preventing EDA from selling the site to Titan. They asserted, as they had in the prior action, that sale of the land to Titan did not meet the criteria established by statute and EDA rules for such a sale. Following a hearing on the request for a temporary injunction, the circuit court entered an order denying Riverton's and the Fritts' request for a temporary injunction. Applying a liberal interpretation of the Industrial Development and Revenue Bond

5

Act, Code §§ 15.2-4900 through -4920, the circuit court concluded that a facility, new to a community, qualified under the Act as a new industry in the Commonwealth, that EDA's variance from its own guidelines did not make the sale arbitrary and capricious because such guidelines can be altered by EDA at any time, and that the sale did not constitute special legislation merely because it benefited Titan. Finally, in denying the temporary injunction, the trial court stated that "[w]ithout proof of damage particular to [Riverton and the Fritts] of an irreparable character, the plaintiffs' standing to maintain this action is called into question." EDA voted to sign the contract of sale to Titan on November 12, 1999, and the sale was completed the same day.

On October 8, 1999, prior to the completion of the sale of the EDA site to Titan, the zoning administrator approved Titan's application for a by-right permit for its facility to be built on the EDA property. The Planning Commission approved the by-right use of the property on October 13. Riverton and the Fritts appealed the zoning administrator's and the Planning Commission's decisions to the BZA. On December 1, 1999, the BZA concluded that it lacked jurisdiction to review the Planning Commission's by-right determination, but deferred its ruling on the issue whether the zoning administrator properly approved the by-right application.

6

On December 8, 1999, Titan brought an action against the BZA, Riverton, and the Fritts asking the court to direct the BZA to terminate the stay and dismiss the appeal of the zoning administrator's and Planning Commission's decisions and to enjoin Riverton and the Fritts from further litigating the by-right issue regarding the EDA site, asserting that that issue was resolved in the earlier case regarding the Potomac Edison site. The circuit court denied Titan's requests, finding that the current proceedings involved a different site and different parties.

A month later, the BZA concluded that Riverton and the Fritts did not have standing to appeal the zoning administrator's decision to the BZA. Riverton and the Fritts appealed this decision. The circuit court remanded the issue of standing to the BZA, but rejected the contention raised by Riverton and the Fritts that Titan did not have the right to seek the by-right permit.

On remand, the BZA determined that the Fritts had standing to appeal the administrative decisions to the BZA, but that Riverton did not. The BZA also concluded that the proposed facility was a by-right use of the EDA site and consistent with the zoning ordinance. Titan appealed the BZA's determination regarding the Fritts' standing and the Fritts appealed the BZA's conclusion regarding the use of the site for Titan's facility.

On May 31, 2000, the circuit court affirmed the decision of the BZA. The Fritts appealed the circuit court order to this Court. An appeal was awarded and the decision of the circuit court was affirmed by an opinion issued September 14, 2001. Fritts v. Carolinas Cement Co., 262 Va. 401, 551 S.E.2d 336 (2001).

### B. This Litigation

Titan filed this suit on October 28, 1999 alleging tortious interference with contract and business expectancy, statutory and common law conspiracy and defamation based on the litigation pursued and financed by Riverton. Titan also filed requests for admissions, interrogatories and requests for documents. Riverton filed a demurrer and a motion for a protective order, asserting that the claim was barred by the Noerr-Pennington doctrine. Although Riverton's first demurrer was overruled by the trial court, the trial court granted Riverton's motion for summary judgment in part, finding that the underlying proceedings were brought with probable cause, but deferred ruling on Titan's arguments that such proceedings were nevertheless sham proceedings because Riverton orchestrated the litigation through the use of straw persons. The trial court granted Riverton's motions to prohibit discovery concerning its motivation for pursuing the litigation and granted a stay on further discovery pending its ruling on the straw persons issue. After further briefing by the parties, the trial court entered

8

an order on June 6, 2000, holding that Riverton's use of straw persons was not a fraud upon the tribunal and did not constitute sham litigation depriving Riverton of the protection of the Noerr-Pennington doctrine.

Titan filed an amended motion for judgment and second amended motion for judgment, adding claims of abuse of process and fraud. Riverton's demurrers to both pleadings were sustained in part and denied in part and the trial court dismissed with prejudice all claims to which Riverton's demurrers were sustained. The trial court entered an order granting Titan's motion to non-suit all remaining claims. We awarded Titan an appeal.

On appeal, Titan asserts that the Noerr-Pennington doctrine should not be applied to the causes of action pled in this case, that even if the doctrine is applied, the trial court applied the wrong test, that Titan's allegations of sham activity by Riverton were sufficient to withstand a demurrer, that the trial court should not have considered whether Riverton was entitled to the protection of the Noerr-Pennington doctrine without discovery and further development of the evidence, and that the trial court erred in holding that defamatory statements made by Riverton were entitled to an absolute privilege. We will address these issues in order.

## DISCUSSION

A.  The Noerr-Pennington Doctrine

1.  Application to state law conspiracy and business tort
    claims

The Noerr-Pennington doctrine was initially developed in
the United States Supreme Court cases of Eastern Railroad
Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127
(1961), and United Mine Workers of America v. Pennington, 381
U.S. 657 (1965).  In those cases, the Supreme Court held that
actions taken to influence legislative or executive action
cannot be the basis for a violation of the Sherman Antitrust Act
unless such activities were "a mere sham" designed to disguise
actions directed towards interfering with the business
relationships of a competitor.  Noerr, 365 U.S. at 144.  This
doctrine is based on the federal constitutional rights to free
speech and to petition the government.  In subsequent cases, the
doctrine has been expanded to apply to actions taken in
adjudicatory proceedings before administrative agencies and
courts.  California Motor Transp. Co. v. Trucking Unlimited, 404
U.S. 508, 510-11 (1972).

Titan argues that the Noerr-Pennington doctrine should not
be extended to state law claims of the type raised in this case
because the doctrine was developed in the context of the federal
antitrust laws and because Virginia law affords a defendant

sufficient defenses "without the need to inject an additional defense based on the Noerr-Pennington doctrine."

The Noerr-Pennington doctrine arises from rights afforded by the First Amendment to the United States Constitution and does not limit protection of those rights to causes of action involving antitrust matters. See, e.g., Pacific Gas & Elec. Co. v. Bear Stearns & Co., 791 P.2d 587, 594 (Cal. 1990); Protect Our Mountain Env't v. County of Jefferson, 677 P.2d 1361, 1365-66 (Colo. 1984); Harrah's Vicksburg Corp. v. Pennebaker, 812 So. 2d 163, 171 (Miss. 2001). We have previously acknowledged that the Noerr-Pennington doctrine is concerned with efforts to affect the decisions of legislative, judicial, and executive bodies in the field of public policy matters. Lockheed Info. Mgmt. Sys. Co., Inc. v. Maximus, Inc., 259 Va. 92, 104, 524 S.E.2d 420, 426-27 (2000) (citing F. Buddie Contracting, Inc. v. Seawright, 595 F. Supp. 422 (N.D. Ohio 1984)). While we have rejected the application of the doctrine when the government is acting in its proprietary capacity under the "commercial activity exception," the rationale underlying that exclusion does not exist in this case. Id., 524 S.E.2d at 427. This case involves actions seeking to enforce or challenge governmental decisions through the use of the courts and, thus, falls squarely within the constitutional protections recognized by the Noerr-Pennington doctrine. We conclude that the protection of

11

First Amendment rights provided by application of the Noerr-Pennington doctrine should be available to a defendant in causes of action for tortious interference with business expectancy and conspiracy, and that the trial court did not err in applying the Noerr-Pennington doctrine in this case.

2.  Appropriate test for determination of sham litigation

Titan asserts that, even if the Noerr-Pennington doctrine is applicable in this case, the trial court applied the wrong test in considering whether the litigation at issue was sham litigation.  The trial court utilized the two-part test set out in Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49, 60 (1993) (PRE).  Under that test, a court first determines whether the challenged litigation was objectively baseless.  Id.  A case is objectively baseless if the proponent of the litigation lacked probable cause to institute the unsuccessful lawsuit.  Id.  Probable cause in this context means a " 'reasonable belief that there is a chance that [a] claim may be held valid upon adjudication.' "  Id. at 62-63 (quoting Hubbard v. Beatty & Hyde, Inc., 178 N.E.2d 485, 488 (Mass. 1961)).  If such litigation is objectively baseless, the court then makes a subjective inquiry into whether the litigation was filed with an anti-competitive purpose.  Id. at 60.  If the litigation was not objectively baseless, the second inquiry is not necessary.  Id.  In this case, the trial court

12

concluded that none of the underlying actions was objectively baseless and, accordingly, did not consider whether the actions were subjectively pursued for anti-competitive purposes.

Titan argues that the PRE analysis should not be applied in this case because PRE involved a single underlying action, not a series of proceedings as in this case. Rather, Titan asserts that the trial court should have applied the test suggested by language in California Motor Transport, a case involving multiple underlying actions. 404 U.S. at 515. Titan argues, based on California Motor Transport, that courts must apply a subjective test when multiple filings are alleged to have been "pursued to harass, delay and coerce a competitor." Titan describes that test as looking at "the totality of the filings and determin[ing] whether they were truly undertaken out of a genuine interest in redressing grievances, or whether they were merely a part of a pattern or practice of successive filings undertaken for the purpose of harassing and injuring a competitor." Whether there was probable cause to file an action is irrelevant in this test, according to Titan. Therefore, Titan argues that the trial court in this case should not have looked to whether the litigation undertaken directly or indirectly by Riverton was objectively baseless but rather should have considered whether the litigation was pursued for the purpose of harassing and injuring its competitor.

13

We disagree with Titan and its interpretation of California Motor Transport. The United States Supreme Court in PRE considered California Motor Transport and other cases decided since Noerr and concluded that "the sham exception contains an indispensable objective component" and a subjective "anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham." PRE, 508 U.S. at 58-59. The language in California Motor Transport upon which Titan relies for the test it advocates is the statement that "a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused." California Motor Transport, 404 U.S. at 513. This statement specifically identifies baseless litigation as forming the pattern of harassment, a requirement consistent with the test established in PRE.

Considering the holdings in both PRE and California Motor Transport, we find no support for the imposition of a single, subjective test based on a finding of anti-competitive purpose simply because a series of actions rather than a single action is the focus of the alleged anti-competitive activity. We conclude that, when considering an allegation that the sham exception to the Noerr-Pennington doctrine applies, a court must consider first whether any or all of the complained of actions were objectively baseless, and those which are not may not be

14

considered in determining whether the sham exception is applicable. Therefore, the trial court in this case did not err in applying the two-part test as described in PRE.

    3.   Standing to claim the protection of the Noerr-Pennington doctrine.

Titan argues that Riverton was not entitled to the protection of the Noerr-Pennington doctrine because such protection is available only to those persons or entities that are parties to the underlying litigation. Relying on In re Burlington Northern, Inc., 822 F.2d 518 (5th Cir. 1987), cert. denied sub nom. Union Pacific Railroad v. Energy Transportation Systems, Inc., 484 U.S. 1007 (1988), Titan asserts that a person without standing to bring a suit cannot "manufacture standing" by "orchestrating litigation" for the purpose of interfering with a competitor. Titan argues that Riverton's lack of standing in the underlying litigation denies Riverton the protection of the Noerr-Pennington doctrine for its actions in supporting, soliciting, and financing others in the prosecution of that litigation.

The trial court considered these same arguments in connection with its ruling on Riverton's demurrer and motion for partial summary judgment on Titan's original motion for judgment. The trial court rejected Titan's arguments, adopting the rationale of the federal district court in Baltimore Scrap

15

Corp. v. The David J. Joseph Co., 81 F. Supp. 2d 602 (D. Md. 2000). In that case, the district court held that the Noerr-Pennington doctrine applied even if a company secretly and for anti-competitive purposes, sponsored a lawsuit against a competitor, "so long as the lawsuit is neither a sham, meaning that it is not objectively baseless, nor fraudulent." Id. at 603. The United States Court of Appeals for the Fourth Circuit subsequently affirmed the federal district court's holding that the defendants' participation in the underlying action was not determinative in the sham litigation analysis and that "[f]unding of litigation by a non-party can be petitioning to the same extent" as actually filing the lawsuit. Baltimore Scrap Corp. v. The David J. Joseph Co., 237 F.3d 394, 401 (4th Cir.), cert. denied, 533 U.S. 916 (2001). In reaching its holding, the Fourth Circuit observed that

> nonparties often provide aid to litigants, whether through financial backing, legal assistance, amicus briefs, or moral support. . . . The realities often are that litigation cannot be entirely financed out of the pocket of the party bringing suit. . . . To hold that only parties who have standing in their own right receive the protection of Noerr-Pennington immunity is to artificially restrict that doctrine by penalizing even the lawful support of objectively meritorious actions.

Id. at 401.

We consider this rationale the more persuasive and proper application of the Noerr-Pennington doctrine. Accordingly, we

16

conclude that the trial court did not err in holding that Riverton's support for and financing of the litigation brought by others did not exclude Riverton from the protection afforded by the Noerr-Pennington doctrine.

### B. Demurrer

Next Titan asserts that the trial court should not have decided this matter on demurrer. Applying the principle that a pleading that sufficiently states a cause of action survives a demurrer, Titan argues that each of its pleadings sufficiently recited facts which if proved at trial would have invoked the sham exception to the Noerr-Pennington doctrine, and therefore the trial court should have denied Riverton's demurrers. We disagree with Titan.

When the Noerr-Pennington doctrine and accompanying sham exception were invoked in Titan's pleadings and challenged by Riverton's demurrers, the trial court was required to consider the facts alleged in the pleadings as true and to draw all reasonable inferences from those facts in favor of Titan. However, the trial court was not required to accept Titan's conclusions of law and, thus, the trial court was not bound by Titan's allegations in its pleadings that the litigation in question was baseless. Yuzefovsky v. St. John's Wood Apartments, 261 Va. 97, 102, 540 S.E.2d 134, 137 (2001). To rule on the demurrer, the trial court was required to apply the

two-part PRE test and the initial focus of the court's inquiry was whether the underlying litigation was objectively baseless.

To make this determination, the trial court took judicial notice of the records of the underlying actions, a procedure long recognized as appropriate by our jurisprudence.

> [W]here the plaintiff refers to another proceeding or judgment, and specifically bases his right of action, in whole or in part, on something which appears in the record of the prior case, the court, in passing on a demurrer to the complaint, will take judicial notice of the matters appearing in the former case.

Fleming v. Anderson, 187 Va. 788, 794-95, 48 S.E.2d 269, 272 (1948); see also Martone v. Martone, 257 Va. 199, 208, 509 S.E.2d 302, 307 (1999). The issue before the trial court was the objective legal merit of each of the underlying proceedings. Following a review of each proceeding, the trial court, which conducted those underlying proceedings, concluded that Riverton had probable cause to pursue each of the proceedings and, therefore, those cases were not objectively baseless. Having made this determination, the trial court did not have to reach the second part of the PRE test by considering Titan's allegations of sham activity when ruling on Riverton's demurrer.

## C. Discovery Limitation

Titan also complains that, in light of its allegations of fraud and misrepresentation, the trial court erred in limiting discovery and making a probable cause determination without

18

further development of the evidence. Titan asserts that making the probable cause determination solely on the basis of the record of the underlying proceedings as a matter of law is proper only if "there is no dispute over the predicate facts of the underlying legal proceeding." PRE, 508 U.S. at 64-65. Here, Titan alleges disputed facts in the underlying litigation regarding "secret conspiracies," the use of straw persons, Riverton's "surreptitious orchestration and involvement" in the underlying litigation, and that named litigants were not members of a "citizens group." These matters involve Riverton's motivation for participating in the proceedings and the manner in which the litigation proceeded and do not address the predicate facts of the underlying legal proceedings.

Clearly, the parties had divergent views on the legal implications of the facts in the underlying litigation, such as: whether Titan's proposed facility was a warehouse or distribution center entitled to a by-right permit; could the access road to the facility be used for industrial purposes; were the notice provisions of the Freedom of Information Act violated; and did EDA comply with existing law and internal rules in selling its property to Titan? These disputes, however, are not disputed facts in the underlying litigation that would prevent a court from determining whether the

19

underlying litigation was "objectively baseless" as a matter of law.

Finally, Titan urges that the trial court erred in making its probable cause rulings "in a vacuum" without further discovery on Titan's allegations that Riverton engaged in "concealments and misrepresentations, the full extent of which could not be known without ordinary discovery." We agree with Titan that the protection of the Noerr-Pennington doctrine should not be based on a judgment obtained by fraud and that intentional misrepresentations made to a court may deprive a proceeding of its legitimacy. But such alleged misrepresentations must be material to the underlying proceedings. To make this determination, the court examines the record of the underlying proceedings, the outcome of those cases, the nature of the alleged fraud or misrepresentation, and whether those allegations would have had an impact on the outcome of the underlying litigation. See Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P., 129 F. Supp. 2d 578, 593 (W.D. N.Y.), aff'd, 229 F.3d 1135 (2nd Cir. 2000), cert. denied, 532 U.S. 1037 (2001). If this analysis shows that the alleged misrepresentations did not have a significant impact on the underlying litigation, further discovery is not necessary:

> To allow [ ] claims based solely on broad and
> indistinct allegations of misrepresentation and "sham
> litigation" to reach discovery, regardless of the role

> the claimed misrepresentations played, or could have played, in the prior proceeding would predicate the viability of [a] complaint on a petitioner's subjective intent, and not the objective merit of its petition, and thus directly contravene the Supreme Court's holding in PRE.

Id. at 594 (citations and quotations omitted).

In this case, Titan's allegations of fraud and misrepresentations, as we have already noted, concerned Riverton's motivation in pursuing or supporting the underlying actions. Allegations that Riverton solicited and financed litigation by others, even if its involvement was kept from the court, is not the type of fraud on the court that would bring into question the legitimacy of the proceeding, Baltimore Scrap, 237 F.3d at 401-02, especially when the court has determined that the litigation was brought with probable cause and was not objectively baseless.

The trial court carefully reviewed each of the underlying actions, including Riverton's suit based on an alleged violation of the Freedom of Information Act and the continuation of the appeal before this Court regarding the Potomac Edison site. In each instance the trial court concluded that none of the suits was objectively baseless. As stated by the trial court "[w]hile Riverton may have gotten perilously close to the line, it did not cross it." In light of this record, we conclude that the trial court did not err in considering whether there was

probable cause to pursue the underlying litigation based on the records of those proceedings without allowing further discovery.

Titan has challenged the use of the Noerr-Pennington doctrine in this case and the manner and circumstances under which it was applied.  Titan has not challenged the trial court's probable cause determinations based on the record of any of the underlying proceedings.  Accordingly, the trial court's conclusion that Riverton had probable cause to pursue that litigation is not before us for review.

## D.  Defamation

In its September 13, 1999 bill of complaint seeking a writ of mandamus, a declaratory judgment, and an injunction against the sale of the EDA site to Titan, Riverton alleged that "the Commission of the European Communities and the Restrictive Practices Court in London have found that Titan and a Tarmac subsidiary, respectively, have violated European antitrust laws by engaging in collusive, anti-competitive activities in the cement industry, including market sharing and price fixing." Titan asserts that this statement was per se defamatory.  The trial court sustained Riverton's demurrer to Titan's defamation count, concluding that the statement was entitled to an absolute privilege because it was made in the course of litigation. Titan assigns error to this holding.

A statement made in the course of a judicial proceeding is absolutely privileged if it is material and relevant to the proceeding.  Donohoe Constr. Co. v. Mount Vernon Associates, 235 Va. 531, 537, 369 S.E.2d 857, 860 (1988).  Such statements are privileged because of the safeguards in those proceedings, including rules of evidence and penalties for perjury.  Lockheed, 259 Va. at 101, 524 S.E.2d at 424-25.  Titan argues that the statement at issue here had no bearing on the issue in the litigation which was a suit "to compel [EDA] to comply with the Freedom of Information Act."  The matter was settled by agreement on the pleadings with no evidence taken.  Under these circumstances, Titan concludes that the allegedly defamatory statement was not entitled to absolute privilege.

Titan's argument overlooks the second part of Riverton's mandamus proceeding in which Riverton sought a declaratory judgment and injunction precluding the sale of the land by EDA to Titan.  In that count, Riverton alleged that, by statute, EDA was required to consider the public interest in determining whether it would sell the site to Titan.  Whether the sale would be in the public interest if the site were to be used to facilitate unfair competition was an issue before EDA and the circuit court and, therefore, statements regarding Titan's past actions were relevant.  Finally, settlement of the litigation before consideration of all the counts does not deprive

23

statements relevant to the untested allegations of the protection of absolute privilege.  Furthermore, the trial court judge in this case conducted all the underlying proceedings including the mandamus action.  He was aware of all the arguments made and their relevance to the causes of actions before him.

Based on this record, we cannot say that the trial court was in error as a matter of law in determining that the allegedly defamatory statement was relevant to the proceedings.

For the reasons stated above, we hold that the trial court did not err by applying the Noerr-Pennington doctrine to the state tort claims at issue here; that the trial court properly applied the two-step analysis from PRE when determining that Riverton's actions did not fall within the sham exception to the Noerr-Pennington doctrine; that the trial court did not err by deciding that Riverton had standing to claim the Noerr-Pennington doctrine as a defense; that the trial court properly made the determination regarding whether Riverton had probable cause to bring the underlying proceedings based on the record of those proceedings without allowing or considering additional discovery or evidence; and that the trial court did not err in sustaining Riverton's demurrer to Titan's defamation count.

Accordingly, we will affirm the judgment of the trial court.