JOHNSON, Justice.
 

 liWe granted this writ application to determine whether the court of appeal correctly affirmed the trial court’s grant of the defendants’ Motions for Summary Judgment, finding that the defendants were immune from any liability by applica
 
 *958
 
 tion of the
 
 Noerr-Pennington
 
 doctrine. Because we find that
 
 Noerr-Pennington
 
 does not apply to grant civil immunity for the defendants’ illegal actions, we reverse the decision of the court of appeal.
 

 FACTS AND PROCEDURAL HISTORY
 

 On December 1, 1998, Plaintiff, Astoria Entertainment, Inc. (“Astoria”), filed suit against defendants Edward DeBartolo, Jr.
 
 [1]
 
 (“DeBartolo”) and Robert Guidry (“Gui-dry”), as well as numerous other defendants,
 
 [2]
 
 essentially alleging that it was not awarded a license to operate a riverboat casino due to the defendants’ corrupt ^practices which permeated the riverboat gaming licensing process in Louisiana from 1991 to 1998. Astoria initially filed suit in federal court on November 12,1998. The original Complaint was premised solely on the defendants’ alleged violations of the Racketeer Influenced and Corrupt Organizations Act (“RICO”), 18 U.S.C.1961
 
 et seq.,
 
 and sought civil damages under that statute. The suit named numerous defendants, including DeBartolo and Guidry. The federal case was stayed on April 11, 1999, pending the prosecution and conclusion of the criminal proceeding in the Middle District of Louisiana captioned
 
 United States v. Edwin Edwards, et al.,
 
 Cr. No. 98-165B. The stay was eventually lifted on February 23, 2001, after the criminal convictions were returned and sentences imposed. On March 6, 2001, Astoria filed an amended complaint in federal court, adding allegations of Sherman and Clayton Antitrust Act violations, as well as several causes of action under Louisiana state law. As in this case, the gist of Astoria’s complaint was that it would have received a license to operate a riverboat casino in the absence of corruption. Defendants filed a Motion to Dismiss, which was granted by the federal court. The court found that Astoria’s antitrust action was prescribed, and additionally found that the
 
 Noerr-Pennington
 
 doctrine applied to shield the defendants from federal antitrust liability. The court dismissed Astoria’s federal Sherman antitrust and RICO claims with prejudice. Holding that the dismissal of Astoria’s federal antitrust claims deprived the federal court of jurisdiction, the court declined to rule on Astoria’s state claims, and dismissed them without prejudice, thereby preserving Astoria’s right to pursue them in state court.
 
 Astoria Entm’t, Inc. v. Edwards,
 
 159 F.Supp.2d 303, 320-321 (E.D.La.2001).
 

 In 1991, the Louisiana Riverboat Economic Development and Gaming Control Act (“the Act”) was enacted, which authorized the licensing and operation of fifteen | ^riverboat casinos.
 
 [3]
 
 The Act created two separate bodies within the Department of Public Safety and Corrections and vested each with separate duties and responsibilities in furtherance of the Act’s purposes.
 
 [4]
 
 
 *959
 
 See:
 
 State Through Dept. of Public Safety and Corrections v. Louisiana Riverboat Gaming Commission and Horseshoe En-tertamment,
 
 94-1872 (La.5/22/95), 655 So.2d 292. The Gaming Enforcement Division was vested with regulatory and enforcement powers, and the Riverboat Gaming Commission (“the Commission”) was a rule and policy making body appointed by the Governor and confirmed by the Louisiana Senate.
 
 Id.
 
 at 296. Under its rule-making powers, the Commission required any prospective riverboat operator to apply to the Commission for a Certificate of Preliminary Approval (“CPA”). See former La. Admin. Code 42:XIII.303.
 
 [5]
 

 In short, at issue in this litigation are two riverboat licenses — one that was awarded to Guidry in 1993, and one that was awarded to DeBartolo in 1997. According to Astoria’s Petitions, it originally pursued a license to operate a riverboat casino in Kenner, but abandoned that plan when it learned that Guidry “had been guaranteed” a Kenner license because of his “close relationship” with former Governor Edwin Edwards. Astoria contends that it then sought to pursue a Gretna license, and filed an application for a CPA to operate a riverboat in Gretna. Astoria alleges that despite promises of support from some Commission members, it failed |4to obtain a CPA as a result of corruption. The 1997 license (“15th license”) was eventually awarded to DeBartolo after a license previously awarded to another company was abandoned. Astoria alleges that De-Bartolo paid Edwards $400,000.00 to prevent problems with his license application. Astoria asserts that DeBartolo’s actions made it impossible for Astoria to have a fair and impartial consideration of its application for the 15th license, but Astoria makes no specific allegation that it actually applied for that particular license.
 

 The crux of Astoria’s argument is that DeBartolo and Guidry corrupted the licensing process by making illegal payments to former Governor Edwin Edwards in order to obtain Edwards’ assistance in obtaining casino licenses for their respective companies;
 
 [6]
 
 and, but for their corrupt actions, Astoria would have received a license.
 
 [7]
 

 The defendants filed various exceptions, including exceptions of no cause of action, which were denied by the trial court on February 13, 2004. On September 7, 2004, the court of appeal granted the defendants’
 
 *960
 
 writ applications, reversing the trial court’s denial of their exceptions of no cause of action. The court of appeal stated:
 

 [T]he
 
 Noerr-Pennington
 
 doctrine is applicable to all of the claims set forth by Astoria against the defendant-relators in this case, specifically the claims for tortious interference (with economic and/or prospective business advantage), the claims for violations of the Louisiana Unfair Trade Practices and Consumer Protection Law and any other such unfair trade practices claims (such as under California law), the claims for conspiracy, and the claims for unjust enrichment. Therefore, we reverse the judgment of the trial court....
 

 Astoria Entertainment, Inc. v. Edward J. DeBartolo, Jr., et al,
 
 2004-C-0415 c/w Jjj2004-C-0417, 2004-C-0430, 2004-C-0431 (La.App. 4th Cir.9/7/04), unpub.
 

 Astoria then filed a writ application in this Court, which we granted with an order reversing the decision of the court of appeal. Specifically, this Court stated:
 

 The
 
 Noerr-Pennington
 
 doctrine provides an affirmative defense.
 
 Bayou Fleet v. Alexander,
 
 234 F.3d 852 (5th Cir.2000), and
 
 Acoustic Systems, Inc. v. Wenger Corp.,
 
 207 F.3d 287 (5th Cir. 2000). Affirmative defenses must be raised in the answer. La.Code Civ. P. art. 1003 and art. 1005. The court of appeal was premature in reaching this issue in the context of an exception of no cause of action. Accordingly, the judgment of the court of appeal is vacated and the judgment of the district court denying the exception of no cause of action is reinstated.
 

 Astoria Entertainment, Inc. v. Debartolo, Jr., et al.,
 
 2004-2472 (La.1/7/05), 891 So.2d 687.
 

 Following remand to the trial court, DeBartolo filed an answer asserting defenses, including
 
 Noerr-Pennington.
 
 Gui-dry amended his answer to assert a
 
 Noerr-Pennington
 
 defense. Defendants subsequently moved for summary judgment asserting that they were entitled to immunity pursuant to the
 
 Noerr-Pen-nington
 
 doctrine.
 
 [8]
 
 The trial court granted the defendants’ motions for summary judgment, finding that it was bound by the court of appeal’s previous ruling on the applicability of
 
 Noerr-Pennington.
 
 Astoria appealed. While the court of appeal agreed with Astoria.that its previous vacated decision was not law of the case and had no force or effect, the court of appeal again found, as a matter of law, that the
 
 Noerr-Pennington
 
 doctrine was dispositive. Astoria filed the instant writ application in this Court, which we granted.
 
 Astoria Entertainment, Inc. v. Debartolo, et al,
 
 2008-1690 (La.10/31/08), 993 So.2d 221.
 

 DISCUSSION
 

 Origins of the Noerr-Pennington Doctrine
 

 The
 
 Noerr-Pennington
 
 doctrine is derived from two United States Supreme | fiCourt decisions:
 
 Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,
 
 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and
 
 United Mine Workers v. Pennington,
 
 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). This immunity doctrine essentially provides that private parties who petition the government for governmental action favorable to them are not in violation of the antitrust laws, even
 
 *961
 
 though their petitions are motivated by anticompetitive intent. 5 Ronald D. Rotunda & John E. Nowak,
 
 Treatise on Constitutional Law: Substance and Procedure,
 
 § 20.54(e) (4th ed.2008). The Court derived its decision in
 
 Noerr
 
 from the premise set forth in
 
 Parker v. Brown,
 
 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), that the States have freedom to engage in anticompetitive regulation.
 
 Parker
 
 provides immunity to governments and government actors from anti-trust claims, finding that the Sherman Act was intended to restrain only private action, but did not apply to anticompetitive restraints imposed by the State “as an act of government.”
 
 Parker,
 
 317 U.S. at 352, 63 S.Ct. 307.
 
 [9]
 
 However,
 
 Parker
 
 did not immunize the private parties who urge government or government actors to engage in anti-competitive regulation from antitrust liability. Reasoning that if state action, even if anticompetitive, is immune from antitrust liability, then petitioning the state for that action should not be unlawful, the Court developed a corollary to the
 
 Parker
 
 doctrine in
 
 Noerr. Noerr,
 
 365 U.S. at 137, 81 S.Ct. 523.
 

 In
 
 Noerr,
 
 the Court held that railroads, which had embarked on an advertising campaign designed to convince the legislature to pass laws which were detrimental to the trucking industry, were not subject to antitrust liability for those actions, even though their ultimate goal was to drive trucks out of business and limit the competition. In so holding, the Court concluded that “the Sherman Act did not reach political activity, nor was the anticompeti-tive purpose of the railroads in initiating the advertising campaign, nor their deception in conducting that campaign, relevant to |7the antitrust analysis.”
 
 Noerr,
 
 365 U.S. at 138-141, 81 S.Ct. 523. The Court held that “the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or executive to take particular action with respect to a law that would produce a restraint or monopoly.”
 
 Id.
 
 at 136, 81 S.Ct. 523.
 

 The Court explained that to hold otherwise “would substantially impair the power of government to take actions through its-legislature and executive that operate to restrain trade.”
 
 Id.
 
 at 137, 81 S.Ct. 523. The Court stated that:
 

 [t]o hold that the government retains the power to act in [a] representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act.
 

 Id.
 
 at 137, 81 S.Ct. 523.
 

 The Court further reasoned that to construe the Sherman Act differently would raise important constitutional questions. The First Amendment protects the right of the people “to petition the Government for a redress of grievances.” U.S. Const, amend. I. The Court explained:
 

 The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms. Indeed, such an imputation would be particularly unjustified in this case in view of all the countervailing considerations enumerated above. For these reasons, we think it clear that the Sherman Act does not apply to the activities of the railroads at least insofar as those activities comprised mere solicita
 
 *962
 
 tion of governmental action with respect to the passage and enforcement of laws.
 

 Id.
 
 at 138, 81 S.Ct. 523.
 

 Thus, it seems clear that the
 
 Noerr-Pennington
 
 doctrine stems not only from the right to petition governments granted by the First Amendment, but is also based on the recognition that antitrust laws, “tailored as they are for the business world, are not at all appropriate for application in the political arena.”
 
 Noerr,
 
 365 U.S. at 141, 81 S.Ct. 523.
 

 |RFour years after
 
 Noerr,
 
 the Supreme Court issued its opinion in
 
 United Mine Workers v. Pennington,
 
 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In
 
 Pennington,
 
 the Court reaffirmed the principles in
 
 Noerr,
 
 and held that “[jjoint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition.”
 
 Pennington,
 
 381 U.S. at 670, 85 S.Ct. 1585. The Court stated that
 
 Noerr
 
 shields from the Sherman Act a concerted effort to influence public officials “regardless of intent or purpose.”
 
 Id.
 
 In 1972, the Court further extended the
 
 Noerr-Pennington
 
 doctrine to petitions before courts and administrative agencies.
 
 California Motor Transport Co., v. Trucking Unlimited,
 
 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).
 

 The Parties’ Contentions
 

 Astoria
 

 Astoria argues that
 
 Noen-Pennington
 
 is not a single broad brush doctrine which immunizes any activity simply because a politician is involved. Astoria asserts that the application of the doctrine is fact-intensive, and should not have been applied by the lower courts absent discovery by the parties, and fact development regarding the alleged petitioning process.
 

 On the merits of the application of
 
 Noerr-Pennington,
 
 Astoria argues that the defendants’ corruption was not part of any legitimate petitioning that would be protected by the Constitution, as the First Amendment was never meant to be a safe harbor for corruption. Astoria argues that the defendants’ corrupt actions should not be given
 
 Noerr-Pennington
 
 protection.
 

 DeBartolo
 

 DeBartolo argues that
 
 Noerr-Penning-ton
 
 serves as a complete defense to the allegations in Astoria’s petitions. DeBar-tolo argues that
 
 Noerr-Pennington
 
 applies broadly to all efforts to influence governmental action, and that the doctrine is not lalimited to “legitimate” petitioning.
 

 DeBartolo also disputes Astoria’s assertion that
 
 Noerr-Pennington
 
 is a safe harbor for corruption. DeBartolo argues that
 
 Noerr-Pennington
 
 neither permits nor approves of unlawful activity, and that there are criminal statutes to address the types of misconduct that might be involved in improper relations with governmental officials. Here, DeBartolo and Guidry were punished for their actions.
 

 DeBartolo argues that summary judgment was properly granted. Astoria has never articulated what additional facts should have been developed in this case that could change the trial court’s legal analysis. Nor did Astoria request additional time for discovery in opposing the motion for summary judgment.
 

 Guidry
 

 Guidry argues that
 
 Noerr-Pennington
 
 is broadly applied, and had been used by courts to dismiss a variety of claims, including state law claims. Guidry argues that under
 
 Noerr-Pennington,
 
 this Court must look at the conduct in question, not the intent or motivation behind the conduct. Guidry argues that his conduct in attempting to influence the Commission through Edwards is exactly what
 
 Noerr-Pennington
 
 purports to protect.
 

 
 *963
 
 Guidry argues that the trial court properly granted his motion for summary judgment, as Astoria failed to introduce any evidence to contravene the motion and Astoria did not request additional time for discovery. In addition, Astoria never conducted the court-ordered deposition of Gui-dry. Guidry argues that when the government activity in question is clearly defined, a court can conclude as a matter of law whether
 
 Noerr-Pennington
 
 is applicable. Courts routinely resolve this legal issue on the pleadings under motions to dismiss pursuant to Federal Rule of Civil Procedure 12, or motions for summary judgment.
 

 |
 
 inApplication of Noerr-Pennington
 

 La. C.C.P. art. 966(B) provides that a motion for summary judgment will be granted “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law.” This article further provides that the summary judgment procedure is favored and is designed to secure the just, speedy, and inexpensive determination of actions. La. C.C.P. art. 966(A)(2). As an appellate court, we review a judgment granting or denying a motion for summary judgment
 
 de novo. Hood v. Cotter,
 
 2008-0215 (La.12/2/08), 5 So.2d 819, 822 (citing
 
 Bonin v. Westport Ins. Corp.,
 
 05-0886, p. 4 (La.5/17/06), 930 So.2d 906, 910). Thus, we must determine, as the trial court does, whether there is any genuine issue of material fact, and whether the mover is entitled to judgment as a matter of law.
 
 Id.
 
 (citing
 
 Smith v. Our Lady of the Lake Hasp.,
 
 93-2512 (La.7/5/94), 639 So.2d 730, 750).
 

 Astoria’s allegations against DeBartolo and Guidry are essentially allegations that these defendants sought to influence the administrative decision of the Commission in order to obtain a riverboat casino license. The defendants acted by making illegal and/or improper payments to Edwards so that he would use his political influence to obtain a favorable Commission decision. We must determine whether the defendants’ actions, despite their corrupt and illegal nature, are protected from civil liability by
 
 Noerr-Pennington.
 

 This Court has never directly considered the application of
 
 Noerr-Pennington
 
 in our state courts, but we note that this doctrine has been routinely applied in other state courts, even though it arose in the context of federal antitrust litigation. The rationale is that the
 
 Noerr-Pennington
 
 doctrine is made applicable in state courts and |nto state law claims through the Fourteenth Amendment. Moreover,
 
 Noerr-Pennington
 
 is partially rooted in the First Amendment to the United States Constitution, which protects the right of the people to petition the government for a redress of grievances. Similarly, the Louisiana Constitution provides that “[n]o law shall impair the right of any person to assemble peaceably or to petition government for a redress of grievances.” La. Const, art. 1, § 9. And, while the United States Supreme Court has not addressed
 
 Noerr-Pennington
 
 outside of the context of antitrust litigation, numerous federal and other states’ high courts have, for years, extended this immunity to cases involving other types of claims.
 

 In applying
 
 Noerr-Pennington
 
 to a tort claim, the United States Fifth Circuit noted that although the
 
 Noerr-Pennington
 
 doctrine initially arose in the antitrust field, other circuits had expanded the doctrine to claims brought under federal and state laws, including § 1983 and common-law tortious interference with contractual relations claims.
 
 Video International Production, Inc. v. Wamer-Amex Cable Communications, Inc.,
 
 858 F.2d 1075, 1084
 
 *964
 
 (5th Cir.1988),
 
 cert. denied,
 
 491 U.S. 906, 109 S.Ct. 3189, 105 L.Ed.2d 697 (1989) (citing:
 
 Evers v. County of Custer,
 
 745 F.2d 1196, 1204 (9th Cir.1984);
 
 Gorman Towers, Inc. v. Bogoslavsky,
 
 626 F.2d 607, 614 (8th Cir.1980)). The Fifth Circuit reasoned that the same rationale under antitrust law would apply to tort claims because “there is simply no reason that a common-law tort doctrine can any more permissibly abridge or chill the constitutional right of petition than can a statutory claim such as antitrust.”
 
 Video International,
 
 858 F.2d at 1084. See also:
 
 Bayou Fleet, Inc. v. Alexander,
 
 284 F.3d 852 (5th Cir.2000);
 
 Brownsville Golden Age Nursing Home, Inc. v. Wells,
 
 839 F.2d 155 (3rd Cir.1988)
 
 (Noerr-Pennington
 
 doctrine protected individuals from tort liability for their actions in petitioning the government to shut down a nursing home that was operating in violation of applicable | ^regulations);
 
 Tarpley v. Keistler,
 
 188 F.3d 788 (7th Cir.1999)
 
 (Noerr-Penning-ton
 
 doctrine applied to protect defendant from a § 1983 action).
 

 In addition to the federal circuits, other states’ high courts have also applied
 
 Noerr-Pennington
 
 to a variety of claims outside of the antitrust realm. The Mississippi Supreme Court has applied
 
 Noerr-Pennington
 
 to protect a casino’s efforts to lobby the Mississippi Gaming Commission to deny approval of another casino operator’s proposal to build a new casino. The Court applied
 
 Noerr-Pennington
 
 in rejecting the plaintiffs state tort claims of restraint of trade, tortious interference and civil conspiracy.
 
 Harrah’s Vicksburg Corp. v. Pennebaker,
 
 812 So.2d 163 (Miss. 2002). In
 
 Titan America, LLC v. River-ton Investment Corp.,
 
 264 Va. 292, 569 S.E.2d 57 (Va.2002), the Virginia Supreme Court found that the
 
 Noerr-Pennington
 
 doctrine was available to a defendant in causes of action for tortious interference with business expectancy and conspiracy. In
 
 Anderson Development Co., L.C. v. Tobias,
 
 116 P.3d 323 (Ut.2005), the Utah Supreme Court ruled that the lower courts had erred in failing to grant the defendants’ motions for summary judgment based on
 
 Noerr-Pennington
 
 in a claim for intentional interference with prospective economic relations and existing contractual relations. In
 
 Gunderson v. University of Alaska,
 
 902 P.2d 323 (Alaska 1995), the Alaska Supreme Court affirmed the grant of defendants’ motion for summary judgment on the basis of
 
 Noerr-Pennington
 
 in a suit alleging numerous claims, including misrepresentation, tortious interference with contractual relationship, claims under 42 U.S.C.1983, and state antitrust law claims. The Rhode Island Supreme Court has applied
 
 Noerr-Pennington
 
 to common-law tort claims.
 
 Pound Hill Corp., Inc. v. Perl,
 
 668 A.2d 1260 (R.I.1996);
 
 Cove Road Development v. Western Cranston Industrial Park Associates,
 
 674 A.2d 1234 (R.I.1996);
 
 Hometown Properties, Inc. v. Fleming,
 
 680 A.2d 56 (R.I.1996).
 

 113We agree that there is no reason that the constitutional protection of the right to petition should be less compelling in the context of claims that arise outside of the scope of antitrust laws. However, even accepting that
 
 Noerr-Pennington
 
 is generally applicable in our state courts, and to state law claims, we must still determine whether the doctrine is applicable based on the specific facts of this case.
 

 The Supreme Court has specifically carved out only one exception to
 
 Noerr-Pennington
 
 immunity — the “sham” exception. The sham exception applies in cases where a person uses the process of government itself, rather than the outcome of that process, to reduce competition.
 
 Rotunda & Nowak, supra
 
 § 20.54(e)(ii). This exception was explained in
 
 Noerr
 
 as “situations in which a publicity campaign,
 
 *965
 
 ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application.”
 
 Noerr,
 
 365 U.S. at 144, 81 S.Ct. 523. While the sham exception to
 
 Noerr-Pennington
 
 immunity was initially broadly applied by many lower courts, the Supreme Court has limited its application to activities that are “not genuinely intended to influence government action.”
 
 Allied Tube & Conduit Corp. v. Indian Head, Inc.,
 
 486 U.S. 492, 507 n. 10, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988). The Court in
 
 Allied Tube
 
 criticized the use of sham to cover all activities deemed “unworthy of antitrust immunity.”
 
 Id.
 
 The Court emphasized that genuine efforts to influence government does not constitute a sham, no matter how improper the methods used.
 
 Id.
 
 The Supreme Court has explained that to fall under this exception, a defendant’s lobbying activities must be “objectively baseless.”
 
 Professional Real Estate Investors, v. Columbia Pictures Indus. Inc.,
 
 508 U.S. 49, 60, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). Lobbying activities are considered “baseless” if a reasonable private citizen could not “realistically expect success on the merits.”
 
 Id.
 
 at 60, 113 S.Ct. 1920.
 

 |14In this matter, because both Gui-dry and DeBartolo achieved favorable results as a result of their actions, we find that their endeavors were, by definition, not baseless, and thus do not fall under the sham exception. See:
 
 Professional Real Estate Investors,
 
 508 U.S. at 61, n. 5, 113 S.Ct. 1920;
 
 Bayou Fleet,
 
 234 F.3d at 862.
 

 The United States Supreme Court has neither specifically carved out an exception to
 
 Noerr-Pennington
 
 for corrupt or illegal actions, nor applied the doctrine to immunize criminal behavior. And, while the Court, in dicta, has discussed
 
 Noerr-Pen-nington
 
 immunity relative to illegal actions in several cases, we find no guidance in the Court’s statements.
 

 In
 
 California Motor Transport,
 
 the Court stated in dicta that “[t]here are many other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations. Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process.”
 
 California Motor Transport,
 
 404 U.S. at 513, 92 S.Ct. 609.
 

 In
 
 Allied Tube,
 
 the Court again expressed an opinion, also in dicta, that illegal actions, such as bribery, would not merit
 
 Noerr-Pennington
 
 protection. The Court stated that “one could imagine situations where the most effective means of influencing government officials is bribery, and we have never suggested that kind of attempt to influence the government merits protection.”
 
 Allied Tube,
 
 486 U.S. at 504,108 S.Ct. 1931.
 

 However, the Court expressed a different view in
 
 City of Columbia v. Omni Otddoor Advertising, Inc.,
 
 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). In
 
 Omni,
 
 the Court refused to recognize a “conspiracy” exception to
 
 Noerr-Penning-ton
 
 which would apply when government officials conspired with a private party to employ government action as a means of stifling competition.
 
 Id,
 
 at 382, 111 S.Ct. 1344. The Court reasoned that a conspiracy in 115the antitrust sense usually means nothing more than an agreement to impose the regulation in question, and all successful petitioning encompasses an agreement between the petitioner and the government.
 
 Id.
 
 at 375, 383, 111 S.Ct. 1344. The Court also reasoned that applying a conspiracy exception would require examining government officials’ subjective motivation in taking certain action, and this
 
 *966
 
 sort of inquiry would be impracticable.
 
 Id.
 
 at 383-384, 111 S.Ct. 1344. In addressing a suggestion that this problem could be avoided by confining the exception to conduct with some element of unlawfulness, the Court noted that it would then “have nothing to do with the policies of the antitrust laws.”
 
 Id.
 
 at 383, 111 S.Ct. 1344. Specifically, the Court stated:
 

 And if the invalidating “conspiracy” is limited to one that involves some element of unlawfulness (beyond mere anticompetitive motivation), the invalidation would have nothing to do with the policies of the antitrust laws. In
 
 Noerr
 
 itself, where the private party “deliberately deceived the public and public officials” in its successful lobbying campaign, we said that “deception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned.” 365 U.S. at 145, 81 S.Ct. 523.
 

 Id.
 
 at 383-384, 111 S.Ct. 1344.
 
 [10]
 

 As stated earlier, the Supreme Court has not considered
 
 Noerr-Pennington
 
 outside of the antitrust field. And, as further explained, the extension of
 
 Noerr-Pen-nington
 
 beyond antitrust cases by lower courts is based solely on First Amendment considerations. Because the Supreme Court has only considered
 
 Noerr-Pen-nington
 
 immunity in the context of antitrust suits, the Court’s statements regarding this immunity have necessarily been based on the Court’s interpretation of the antitrust laws. Hence, the dicta in
 
 Omni
 
 which suggests that the Court may afford
 
 Noerr-Pennington
 
 protection to illegal actions is not based on First Amendment reasoning, but, rather, is based solely on the Court’s analysis of antitrust laws. Thus, we do not find this language to be persuasive based on the facts of this case.
 

 |1fiIn
 
 Cardtoons, L.C. v. Major League Baseball Players,
 
 208 F.3d 885 (10th Cir. 2000), the United States Tenth Circuit explained:
 

 The logical dilemma in applying
 
 Noerr-Pennington
 
 outside of the antitrust context is that
 
 Noerr’s
 
 first rationale for immunity — an interpretation of the Sherman Act — is not present. Supreme Court precedent gives us scant guidance in resolving this issue. All of the cases in which the Supreme Court has applied
 
 Noerr-Pennington
 
 immunity as such have involved antitrust claims.
 

 Cardtoons,
 
 208 F.3d at 889.
 

 Further, that Court explained that while the circuits have extended
 
 Noerr-Pen-nington
 
 outside of the antitrust context, they have done so solely on the basis of the right to petition, and have eliminated the Sherman Act rationale.
 
 Id.
 
 at 889.
 
 [11]
 

 Because the expansion of
 
 Noerr-Pen-nington
 
 to our state courts, and to state law claims, is based on the First Amendment, rather than federal antitrust laws, we must necessarily look to the First Amendment to reach our decision.
 

 In
 
 McDonald v. Smith,
 
 472 U.S. 479, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985), the
 
 *967
 
 Court considered whether the Petition Clause of the First Amendment provides absolute immunity to a defendant charged with expressing libelous and damaging falsehoods in letters to the President of the United States. The Court noted that:
 

 The First Amendment guarantees “the right of the people ... to petition the Government for a redress of grievances.” The right to petition is cut from the same cloth as the other guarantees of that Amendment, and is an assurance of a particular freedom of expression. In
 
 United States v. Cruikshank,
 
 2 Otto 542, 92 U.S. 542, 28 L.Ed. 588 (1876), the Court declared that this right is implicit in “[t]he very idea of government, republican in form.”
 

 McDonald,
 
 472 U.S. at 482, 105 S.Ct. 2787. However, the Court went on to state that “[although the values in the right of petition as an important aspect of self-government are beyond question, it does not follow that the Framers of the First Amendment believed that the Petition Clause provided absolute immunity from damages for libel.”
 
 Id.
 
 at 483, 105 S.Ct. 2787.
 

 In rejecting the petitioner’s claim of absolute immunity, the Court reasoned that to hold otherwise “would elevate the Petition Clause to special First Amendment status.”
 
 Id.
 
 at 485, 105 S.Ct. 2787. The Court explained that:
 

 “The Petition Clause, however, was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble. These First Amendment rights are inseparable, and there is no sound basis for granting greater constitutional protection to statements made in a petition to the President than other First Amendment expressions.”
 

 Id.
 

 Whereas the right to petition granted by the First Amendment is not absolute, we find no reason to give the defendants’ illegal actions First Amendment constitutional protection. In our view, while the Supreme Court has chosen to cast a wide net of protection afforded by
 
 Noerr-Pennington,
 
 this net should not be expanded to protect illegal activity, especially in claims that arise outside of the scope of antitrust laws.
 

 And, although the dicta from
 
 Omni
 
 may indicate the Court’s reluctance to carve out additional exceptions to
 
 Noerr-Pennington,
 
 this language is far from a clear mandate that the defendants’ corrupt actions must be afforded civil immunity under the doctrine. Considering the extent of criminality alleged to be involved in this case, we do not believe that the United States Supreme Court would be inclined to find that
 
 Noerr-Pennington
 
 provides civil immunity to the defendants. We find that the alleged bribery and corruption in this case are not petitioning activities that should be constitutionally protected. To hold otherwise would give
 
 Noerr-Penning-ton
 
 a |18sweeping effect far beyond the original purpose of the doctrine.
 

 DECREE
 

 For these reasons we find that the court of appeal erred in affirming the trial court’s grant of defendants’ motions for summary judgment. We hereby reverse the decision of the court of appeal, and remand this matter to the trial court for further proceedings.
 

 REVERSED AND REMANDED.
 

 KIMBALL, C.J., and KNOLL and GUIDRY, JJ., concur.
 

 [1]
 

 . DeBartolo's company, DeBartolo Entertainment Louisiana Gaming, Inc., also remains a defendant.
 

 [2]
 

 . Defendants Hollywood Park, Inc., Robert List, Louisiana Gaming Enterprises, Inc., Boomtown, Inc., and Louisiana-I Gaming, L.P., were dismissed without prejudice on March 5, 1999. Defendants Boyd Gaming Corporation, Boyd Louisiana, LLC, Boyd Kenner, Inc., and Treasure Chest Casino, LLC were dismissed with prejudice on October 21, 2003. Defendant, Hollywood Casino Corporation, was dismissed with prejudice on June 18, 2004.
 

 [3]
 

 . This Act was superceded in part in 1996 by the Louisiana Gaming Control Law, La. R.S. 27:1,
 
 et seq.
 
 The portions of the prior law that were not revoked are found at La. R.S. 27:41
 
 et seq.
 

 [4]
 

 . This structure was revoked by the Louisiana Gaming Control Law, La. R.S. 27:1,
 
 et seq.
 
 The Gaming Control Law created the Louisiana Gaming Control Board, which inherited
 
 *959
 
 the powers of both the Gaming Commission and Enforcement Division. However, the two-body structure was still in place at all relevant times in this case.
 

 [5]
 

 . This rule was apparently struck down in
 
 State Through Louisiana Riverboat Gaming Commission v. Louisiana State Police Riverboat Gaming Enforcement Division,
 
 95-2355 (La.App. 1 Cir. 8/21/96), 694 So.2d 316. The court essentially found Commission exceeded its authority by implementing the rule, which gave the Commission licensing power over the intended licensing body, the Louisiana State Police.
 

 [6]
 

 . DeBartolo pled guilty to misprision of a felony in violation of Title 18, United States Code Section 4 on October 6, 1998. Guidry pled guilty to conspiracy in violation of Title 18, U.S.C. § 371 on October 16, 1998. See
 
 U.S. v. Edwards,
 
 39 F.Supp.2d 716, 720 n. 7.
 

 [7]
 

 .Specifically, Astoria, by its original and amending petitions, asserted one or more of the following causes of action against the defendants: (1) intentional interference with economic advantage and/or prospective economic advantage; (2) unjust enrichment to the extent that the defendants were unjustly enriched to the detriment and impoverishment of Astoria; (3) civil conspiracy to corrupt the licensing process; (4) punitive damages under California law for fraud; (5) treble damages under the California business code for unfair trade practices; and (6) violations of the Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401
 
 et seq.
 

 [8]
 

 . Alternatively, Guidry argued that he was entitled to summary judgment because Astoria’s claims were barred by prescription and
 
 res judicata.
 

 [9]
 

 . The Sherman Anti-Trust Act ("Sherman Act”) is codified at 15 U.S.C. § 1, eí
 
 seq.
 
 and was enacted to protect trade and commerce against unlawful restraints and monopolies.
 

 [10]
 

 . This discussion is dicta, as there was no finding of illegal activity in
 
 Omni.
 

 [11]
 

 . The Court cited to
 
 We, Inc. v. City of Philadelphia,
 
 174 F.3d 322, 326-27 (3d Cir. 1999)("This court, along with other courts, has by analogy extended the
 
 Noerr-Penning-ton
 
 doctrine to offer protection to citizens’ petitioning activities in contexts outside the antitrust area as well.... [T]he purpose of
 
 Noerr-Pennington
 
 as applied in areas outside the antitrust field is the protection of the right to petition.”); and
 
 Video Int'l Production, Inc.
 
 v.
 
 Wamer-Amex Cable Communications, Inc.,
 
 858 F.2d 1075, 1084 (5th Cir.1988) ("[a]l-though the
 
 Noerr-Pennington
 
 doctrine initially arose in the antitrust field, other circuits have expanded it to protect first amendment petitioning of the government from claims brought under federal and state laws.... ”).