**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 26, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

MAX W. COLL, II, CATHERINE
JOYCE-COLL, CHARLES T. MURPHY,
BARBARA E. MURPHY, HAYDOCK
H. MILLER, JR.,

      Plaintiffs - Appellants,

v.

FIRST AMERICAN TITLE
INSURANCE COMPANY, NEW
MEXICO PUBLIC REGULATION
COMMISSION, JASON MARKS,
DAVID W. KING, BEN R. LUJAN,
LYNDA M. LOVEJOY, E. SHIRLEY
BACA, NEW MEXICO DEPARTMENT
OF INSURANCE, ERIC SERNA, OLD
REPUBLIC TITLE INSURANCE
COMPANY, INC., COMMONWEALTH
LAND TITLE INSURANCE
COMPANY, LAWYERS TITLE
INSURANCE CORPORATION,
TRANSNATION TITLE INSURANCE
COMPANY, STEWART TITLE
GUARANTY COMPANY, FIDELITY
NATIONAL TITLE INSURANCE
COMPANY, CHICAGO TITLE
INSURANCE COMPANY, TICOR
TITLE INSURANCE COMPANY,
COMMERCE TITLE INSURANCE
COMPANY, UNITED GENERAL
TITLE INSURANCE COMPANY,

No. 08-2174

Defendants - Appellees.

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. Nos. 1:06-CV-00348-WFD-DJS, 1:06-CV-441-WFD-DJS)**

---

Victor R. Marshall, Victor R. Marshall & Associates, P.C., Albuquerque, New Mexico, for Plaintiffs – Appellants.

Charles A. Newman, Sonnenschein Nath & Rosenthal, LLP, St. Louis, Missouri (Richard M. Zuckerman, Sonnenschein Nath & Rosenthal, LLP, New York, New York, Jerry Wertheim, Jerry Todd Wertheim, Jones, Snead, Wertheim & Wentworth, P.C., Santa Fe, New Mexico, David M. Foster, Fulbright & Jaworski, LLP, Washington, D.C., Michael B. Campbell, Holland & Hart LLP, Santa Fe, New Mexico, David Fleischer, Paul, Hastings, Janofsky & Walker LLP, New York, New York, W. Spencer Reid, Thomas C. Bird, Keleher & McLeod, P.A., Albuquerque, New Mexico, Phillip E. Stano and Brian C. Spahn, Sutherland, Washington, D.C., D. James Sorenson, Kemp Smith, LLP, El Paso, Texas, Stephen C. Schoettmer, Thompson & Knight, Dallas, Texas, and Thomas A. Simons, IV, Faith Kalman Reyes, Simons & Slattery, LLP, Santa Fe, New Mexico with him on the brief) for Defendants – Appellees.

---

Before **TYMKOVICH, EBEL,** and **GORSUCH,** Circuit Judges.

---

**EBEL**, Circuit Judge.

---

In this litigation, Plaintiffs challenge New Mexico's statutory scheme regulating title insurance, arguing it is contrary to state law. Here, Plaintiffs appeal the district court's decision dismissing their claims against several title insurance companies that

2

have complied with this New Mexico law. Having jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM.[1]

## I. BACKGROUND

### A. New Mexico Title Insurance Act

In New Mexico, "the business of title insurance [is] totally regulated by the state to provide for the protection of consumers and purchasers of title insurance policies and the financial stability of the title insurance industry." N.M. Stat. Ann. § 59A-30-2(B) (2004) (amended 2009).[2] Through the "Title Insurance Act," N.M. Stat. Ann. §§ 59A-30-1 through 59A-30-15 ("Act"), the New Mexico legislature "provide[s] a comprehensive body of law for the effective regulation and active supervision of the business of title insurance transacted within" the state. Id. § 59A-30-2(A).

The Act requires the state superintendent of insurance, after conducting a public hearing at least once each year, to establish premium rates insurers can charge for title

---

[1] Plaintiffs have asked this Court to certify the questions of state law at issue here to the New Mexico Supreme Court. See generally N.M. Stat. Ann. §§ 39-7-1 through 39-7-13 (providing for certification). We deny that motion, in part because Plaintiffs never requested certification in the district court until after that court dismissed with prejudice their claims against the Insurer Defendants. See Zurich Am. Ins. Co. v. O'Hara Reg'l Ctr. for Rehab., 529 F.3d 916, 926 (10th Cir. 2008) (noting that "[t]his court generally will not certify questions to a state supreme court when the requesting party seeks certification only after having received an adverse decision from the district court").

[2] The New Mexico legislature amended the Title Insurance Act in 2009, after Plaintiffs filed this action. The statutory provisions discussed above are those in effect when Plaintiffs filed this suit.

insurance. See id. §§ 59A-30-4, 59A-30-6, 59A-30-8.[3] Those rates "shall not be excessive, inadequate or unfairly discriminatory and shall contain an allowance permitting a profit that is not unreasonable in relation to the riskiness of the business of title insurance." Id. § 59A-30-6(C). "A person aggrieved by an order of the superintendent promulgating rates under the [Act] shall have the right[]" first to an administrative appeal before the New Mexico Public Regulation Commission ("PRC") and then to review in state court. Id. §§ 59A-17-34 to -35, 59A-30-9. The superintendent also establishes what coverage a title insurer can offer; and the Act mandates that title insurers use only forms promulgated by the superintendent to offer that coverage. See id. §§ 59A-30-4, 5; see also Lisanti v. Alamo Title Ins. of Tex., 55 P.3d 962, 964 (N.M. 2002). See generally N.M. Code R. § 13.14.18 (setting forth title insurance forms).

New Mexico's pervasive regulation of title insurance differs significantly from its regulation of other types of insurance under its general insurance code. "[I]n general," New Mexico's Insurance Code "permit[s] and encourage[s] . . . independent action by and reasonable price competition among insurers" "as an effective way to produce rates" that are not "excessive, inadequate or unfairly discriminatory." N.M. Stat. § 59A-17-3(A)(1)-(2). Regarding premium rates for other types of insurance, the Insurance Code provides that "[r]ates shall not be excessive, inadequate or unfairly discriminatory, nor shall an insurer charge any rate which if continued will have or tend to have the effect of

---

[3] In 2009, the New Mexico legislature amended the Act to require such hearings only during odd-numbered years. See N.M. Stat Ann. § 59A-30-8(A) (2009).

4

destroying competition or creating a monopoly." Id. § 59A-17-6(A) (2004). Generally, the Insurance Code requires insurers to file their premium rates with the superintendent of insurance, and then to abide by those filed rates, which the superintendent must approve. See id. §§ 59A-17-9, 59A-17-12-13.

Importantly, however, the New Mexico Insurance Code expressly does not apply to title insurers, except to the extent that the Title Insurance Act provides otherwise. See id. § 59A-1-15(H) ("No provision of the Insurance Code shall apply to . . . title insurers and title insurance agents, as identified in Chapter 59A, Article 30 NMSA 1978, except as stated in that article."); see also id. § 59A-1-17 ("Provisions of the Insurance Code relative to a particular kind of insurance or type of insurer or particular matter shall prevail over provisions relating to insurance in general or insurers in general or to such matter in general."). While the Title Insurance Act has explicitly incorporated a variety of provisions of the Insurance Code, it has not incorporated Article 17's provisions promoting competition among insurers.[4] See id. § 59A-30-14.

---

[4] For these reasons, Plaintiffs' heavy reliance in their appellate briefs on these provisions in Article 17 of the New Mexico Insurance Code is frequently unavailing. So, too, is their reliance on cases decided under the Insurance Code, including Berry v. Federal Kemper Life Assurance Co., 99 P.3d 1166 (N.M. Ct. App. 2004) (addressing certification of class action seeking damages for life insurers' failure to disclose additional cost for policyholders to pay their premiums installments), and Azar v. Prudential Insurance Co., 68 P.3d 909 (N.M. Ct. App. 2003) (addressing whether life insurers adequately disclosed to policyholders the additional cost of paying their premiums in installments).

## B.  Procedural background

This federal litigation represents the consolidation of two putative class actions begun in New Mexico state court, Coll v. First American Title Insurance Co., and Murphy v. Fidelity National Title Insurance Co.  Plaintiffs are New Mexico citizens who previously purchased title insurance in New Mexico.  They seek to represent a class of thousands of similarly situated purchasers of title insurance covering property located in New Mexico.  Plaintiffs sued two groups of defendants: 1) several title insurance companies ("Insurer Defendants")[5], and 2) the New Mexico Public Regulation Commission ("PRC"), the PRC commissioners, the New Mexico Department of Insurance, and the New Mexico superintendent of insurance ("State Defendants").[6]  The Insurer Defendants removed both of these state-court actions to federal court under the Class Action Fairness Act, 28 U.S.C. § 1332(d).

Plaintiffs' complaints alleged generally that the Title Insurance Act violates numerous New Mexico constitutional and statutory provisions precluding price fixing

---

[5] The Insurer Defendants include: First American Title Insurance Company, Fidelity National Title Insurance Company, Chicago Title Insurance Company, Commerce Title Insurance Company, Commonwealth Land Title Insurance Company, Lawyers Title Insurance Corporation, Old Republic National Title Insurance Company, Stewart Title Guaranty Company, Ticor Title Insurance Company, Transnation Title Insurance Company, and United General Title Insurance Company.

[6] Plaintiffs originally sued Eric Serna in his official capacity as the superintendent of insurance.  When another superintendent was appointed, the district court granted the State Defendants' motion to replace Serna in this case with the new superintendent; Plaintiffs do not challenge that substitution on appeal.  In light of that order, we have substituted in the caption the current New Mexico superintendent of insurance, John Franchini.  See Fed. R. Civ. P. 25(d).

and the creation of monopolies, and that the Insurer Defendants conspired with the insurance superintendent to establish a premium rate that is unreasonably high. Based upon these theories, Plaintiffs sought declaratory and injunctive relief; compensatory, punitive and statutory damages; the Insurer Defendants' disgorgement of their excessive profits; and attorneys' fees and costs.

Defendants moved to dismiss Plaintiffs' claims. The district court did so in part, dismissing with prejudice Plaintiffs' claims against the Insurer Defendants under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief could be granted. Then, without addressing their merits, the district court remanded Plaintiffs' claims against the State Defendants to state court. After these decisions, Plaintiffs filed a motion to amend their complaints, which the district court denied.

## II. APPELLATE JURISDICTION

In this appeal, Plaintiffs challenge both the district court's decision to dismiss their claims against the Insurer Defendants and the district court's denial of leave to amend the complaints. This Court has jurisdiction to review the former, but not the latter.

On April 21, 2008, the district court dismissed Plaintiffs' claims against the Insurer Defendants with prejudice and remanded to state court all of Plaintiffs' remaining claims asserted against the State Defendants. This decision was final and appealable under 28 U.S.C. § 1291 because "it end[ed] the litigation on the merits and [left] nothing for the court to do but execute the judgment." N.M. ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 697 (10th Cir. 2009); see also Hyde Park Co. v. Santa Fe City

7

Council, 226 F.3d 1207, 1209 n.1 (10th Cir. 2000) (holding district court's decision dismissing federal claims was final, notwithstanding that court remanded remaining state-law claims to state court).

The district court, however, did not at that time enter a separate judgment under Fed. R. Civ. P. 58. Before the district court did so several months later, Plaintiffs, on May 20, both moved to amend their complaints and filed a notice of appeal from the April 21, 2008, order.

A party can file a motion to amend the complaint after the district court grants a motion to dismiss. See Triplett v. LeFlore County, 712 F.2d 444, 445-47 (10th Cir. 1983) (reversing district court's implicit denial of motion to amend raised in post-dismissal motion seeking reconsideration); 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure §§ 1488-1489 (2010). When a party does so, this court treats such a motion as one made under either Fed. R. Civ. P. 59 or 60, depending upon when the motion is filed. See Allender v. Raytheon Aircraft Co., 439 F.3d 1236, 1238 (10th Cir. 2006) (treating motion to amend, filed after the time to file a Rule 59 motion, as a Rule 60 motion); Trotter v. Regents of Univ. of N.M., 219 F.3d 1179, 1183 (10th Cir. 2000) (treating motion to amend filed within the time to file a Rule 59 motion as such a motion). A timely filed Rule 59 motion (or a Rule 60 motion filed within twenty-eight days of the entry of judgment) will toll the time to file a notice of appeal. See Fed. R. App. P. 4(a)(4)(A)(v)-(vi).

8

Thus, Plaintiffs' May 20 notice of appeal was premature for two reasons: because it was filed prior to the entry of a Rule 58 judgment and because Plaintiffs had filed a timely tolling motion seeking to amend their complaints. That premature notice of appeal ripened after the district court entered the Rule 58 judgment, on June 25, 2008,[7] and then denied Plaintiffs' motion to amend on June 27, 2008. See Fed. R. App. P. 4(a)(2) ("A notice of appeal filed after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry."); Rule 4(a)(4)(B)(i) ("If a party files a notice of appeal after the court announces or enters a judgment—but before it disposes of any motion listed in Rule 4(a)(4)(A) [including Rule 59 and 60 motions]—the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered."); see also B. Willis, C.P.A., Inc. v. BNSF Ry. Corp., 531 F.3d 1282, 1295 (10th Cir. 2008) (holding premature notice of appeal ripened when district court resolved remaining claims); Warren v. Am. Bankers Ins. of Fla., 507 F.3d 1239, 1244-45 (10th Cir. 2007) (concluding premature notice of appeal ripened when the district court resolved the tolling motion).

After the May 20 notice of appeal ripened, it was sufficient to invoke this court's jurisdiction to review the district court's April 21 order dismissing Plaintiffs' claims against the Insurer Defendants. But, in order to perfect an appeal from the district court's

---

[7] Five days later, on June 30, 2008, the district court entered the identical judgment a second time.

9

later (June 27) decision denying Plaintiffs' post-dismissal motion to amend, Plaintiffs had to file a second notice of appeal:

> A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A) [including motions made under Rule 59 or 60], . . . must file a notice of appeal, or an amended notice of appeal—in compliance with [Fed. R. App. P.] 3(c)—within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion.

Fed. R. App. P. 4(a)(4)(B)(ii); see also Ysais v. Richardson, 603 F.3d 1175, 1179 (10th Cir. 2010), cert. denied, 131 S. Ct. 163 (2010); Laurino v. Tate, 220 F.3d 1213, 1219 (10th Cir. 2000).

Plaintiffs did file a second notice of appeal, on July 29, 2008. But, for several reasons, that second notice of appeal was not effective to give us jurisdiction to review the denial of Plaintiffs' motion to amend. First, the second notice of appeal was untimely when measured from the district court's decision denying the motion to amend, entered on June 27, 2008. Plaintiffs did not file their second notice of appeal until thirty-one days later, on July 29. That notice of appeal, therefore, was one day late. See Fed. R. App. P. 4(a)(1)(A).

Second, the July 29 notice of appeal did not comply with Fed. R. App. P. 3(c)(1)(B), which requires that the notice of appeal "designate the judgment, order, or part thereof being appealed." The July 29 notice of appeal was expressly taken from the district court's entry of a second Rule 58 judgment, which occurred on June 30, 2008. But this second judgment was identical to the first judgment the court entered five days earlier and, thus, it explicitly pertained only to the original April 21 order dismissing

10

Plaintiffs' claims against the Insurer Defendants. The July 29 notice of appeal did not mention the district court's decision denying Plaintiffs' motion to amend the complaints. Further, because the June 30 judgment was identical to the judgment the court first entered June 25, that second judgment did not restart the time to file a notice of appeal from the denial of Plaintiffs' motion to amend. See Fed. Trade Comm'n v. Minneapolis-Honeywell Regulator Co., 344 U.S. 206, 211-12 (1952) ("[T]he mere fact that a judgment previously entered has been reentered . . . in an immaterial way does not toll the time within which review must be sought."); Bridge v. U.S. Parole Comm'n, 981 F.2d 97, 102 (3d Cir. 1992) ("When a court reenters a judgment without altering the substantive rights of the litigants, the entry of the second judgment does not affect the time within which a party must appeal the decisions made in the first order."); Offshore Prod. Contractors, Inc. v. Republic Underwriters Ins. Co., 910 F.2d 224, 229 (5th Cir. 1990) (applying Minneapolis-Honeywell), superseded by rule on other grounds recognized by Catz v. Chalker, 566 F.3d 839, 841 n.1 (9th Cir. 2009).

For these reasons, Plaintiffs failed to file a timely notice of appeal from the district court's decision denying Plaintiffs' post-dismissal motion to amend their complaint. "This court can exercise jurisdiction only if a notice of appeal is timely filed. A timely notice of appeal is both mandatory and jurisdictional." Allender, 439 F.3d at 1239 (internal quotation marks and citation omitted). Therefore, we do not have jurisdiction to review the district court's decision denying Plaintiffs' motion to amend. We, thus,

11

consider here only the district court's decision dismissing with prejudice Plaintiffs'

claims asserted against the Insurer Defendants.

## III. STANDARD OF REVIEW

This court reviews de novo the district court's Fed. R. Civ. P. 12(b)(6) dismissal,

accepting as true all of the well-pled factual allegations and asking "whether it is

plausible that the plaintiff[s] [are] entitled to relief." Bixler v. Foster, 596 F.3d 751, 756

(10th Cir. 2010). Because the claims at issue here are based solely on New Mexico law,

this "court's task is . . . to ascertain and apply the state['s] law." Wade v. EMCASCO

Ins. Co., 483 F.3d 657, 665 (10th Cir. 2007) (internal quotation marks omitted). In doing

so, we

> follow the most recent decisions of the state's highest court. Where no
> controlling state decision exists, [we] must attempt to predict what the
> state's highest court would do. . . . [We] may seek guidance from decisions
> rendered by lower courts in the relevant state, appellate decisions in other
> states with similar legal principles, district court decisions interpreting the
> law of the state in question, and the general weight and trend of authority in
> the relevant area of law. Ultimately, however, the Court's task is to predict
> what the [New Mexico] [S]upreme [C]ourt would do. Our review of the
> district court's interpretation of state law is de novo.

Id. at 665-66 (internal quotation marks and citations omitted).

## IV. DISCUSSION

**A. New Mexico's "filed rate" doctrine precluded Plaintiffs' claims seeking damages
and similar relief from the Defendant Insurers for charging excessive premiums**

12

Plaintiffs contend that the premium rate that the state superintendent of insurance established for title insurance in New Mexico is excessive and unreasonably high.[8] Furthermore, Plaintiffs allege that this rate is the result of the Insurer Defendants acting in concert with the State Defendants to fix prices for title insurance, and that the Insurer Defendants conspired with each other and Superintendent of Insurance Eric Serna to bribe Serna to set unreasonably high title insurance rates. We agree with the district court that New Mexico's "filed rate" doctrine precluded Plaintiffs' claims against the Insurer Defendants to the extent Plaintiffs sought money damages as relief for excessive title insurance premiums.

**1. "Filed rate" doctrine precluded Plaintiffs' claims for damages generally**

New Mexico's "filed rate" doctrine provides that "any filed rate—that is, one approved by the governing regulatory agency—[is] per se reasonable and unassailable in judicial proceedings brought by ratepayers." Valdez v. State, 54 P.3d 71, 74-75 (N.M. 2002) (internal quotation marks and alterations omitted); see also Summit Props., Inc. v. Pub. Serv. Co. of N.M., 118 P.3d 716, 723-24 (N.M. Ct. App. 2005). "[T]he heart of the filed rate doctrine is not that the rate mirrors a competitive market, nor that the rate is reasonable or thoroughly researched, it is that the filed rate is the only legal rate." Valdez, 54 P.3d at 75. "The policy behind the filed rate doctrine is to prevent price

---

[8] Plaintiffs challenge the superintendent's interpretation of the Title Insurance Act to require that he set one premium rate. We agree with the district court that the superintendent's interpretation was reasonable.

discrimination[,] to preserve the role of agencies in approving rates and to keep courts out of the rate-making process." Id.

This doctrine precluded Plaintiffs' claims against the Insurer Defendants for damages relief, including claims seeking restitution, recovery for unjust enrichment and disgorgement of the excessive amounts these Insurer Defendants charged for title insurance premiums sold at the rate set by the superintendent of insurance. See id. at 74-75 (holding "filed rate" doctrine precluded claims for damages challenging rates for collect telephone calls made from state prisons, which were set by the PRC and were higher than those charged to the public generally).[9]

---

[9] Plaintiffs argue that Valdez is not relevant here because that case dealt with telephone rates set by the PRC, while this case instead deals with insurance rates that are set by the state superintendent of insurance and overseen by the PRC. Plaintiffs further argue

> In New Mexico, telephone companies are subject to a system of regulated monopolies, administered by the PRC, a special body created by the Constitution itself, see N.M. Const. art XI, § 2, to protect consumers against natural monopolies like electric utilities, gas utilities, transportation companies, and telephone companies. By contrast, insurance companies are subject to a system of regulated competition, administered by the Insurance Division, which is a purely statutory body which has no constitutional authority.

(Aplt. Br. at 44.) Although New Mexico courts do not appear to have yet applied the "filed rate" doctrine specifically to claims brought against insurers, courts in numerous other jurisdictions have applied the "filed rate" doctrine to the insurance industry generally. See Schermer v. State Farm Fire & Cas. Co., 702 N.W.2d 898, 907 (Minn. Ct. App. 2005) (citing cases; rejecting argument that "competitive and deregulated nature of the private insurance market and the absence of exclusive jurisdiction of the" Minnesota Department of Commerce precluded application of "filed rate" doctrine to the insurance industry), aff'd, 721 N.W.2d 307 (Minn. 2006); Richardson v. Standard Guar. Ins. Co., 853 A.2d 955, 963-65 (N.J. Super. Ct. App. Div. 2004) (agreeing with "considerable

**2. The "filed rate" doctrine also precluded Plaintiffs' damages claims asserted against the Insurer Defendants based upon allegations of conspiracy and bribery to set excessive rates for title insurance**

Plaintiffs further alleged that the Insurer Defendants conspired with and bribed Superintendent of Insurance Eric Serna to set excessive rates for title insurance. More specifically, Plaintiffs alleged in one of their complaints:

72. Defendant insurance companies and defendant Serna have conspired to evade or violate NMSA 1978, § 1-19-34.2 [prohibiting a public officer or employee who works for a regulatory office to solicit funds from an entity regulated by that agency] by using Con Alma Health Foundation, Inc., a purported private foundation. Until he was recently forced by the [PRC] to resign from Con Alma, defendant Serna effectively directed and controlled Con Alma. Defendant Serna or his agents solicited contributions for Con Alma from entities or persons regulated by the Insurance Department, including the defendant insurance companies.

73. In 2003, unidentified persons or entities affiliated with the defendant insurance companies contributed at least $21,750 to Con Alma. The exact identity of these contributors is not currently known to plaintiffs, because Con Alma's contribution report identifies them only as "Title Insurance Industry in NM, 2155 Louisiana Blvd., #4000, Albuquerque NM 87110." The current occupant of those premises is LandAmerica Albuquerque Title Company, which is a division or subsidiary of LandAmerica Financial Group, Inc. The defendants Commonwealth Land Title Insurance

---

weight of authority from other jurisdictions that have applied the filed rate doctrine to ratemaking in the insurance industry," citing cases). In light of this authority, we predict New Mexico courts would apply the "filed rate" doctrine to the pervasively regulated matter of title insurance. Plaintiffs have not shown any reason to reach a different conclusion. Plaintiffs' reliance on the Insurance Code, and specifically N.M. Stat. § 59A-17-3, to argue that "[t]he Insurance Code expressly preserves and promotes competition in insurance" is misplaced. (Aplt. Br. at 45-47.) The Insurance Code specifically provides that "[n]o provision of the Insurance Code shall apply to . . . title insurers and title insurance agents, as identified in Chapter 59A, Article 30 NMSA 1978, except as stated in that article." N.M. Stat. Ann. § 59A-1-15(H) (2004). And, while the Title Insurance Act does incorporate a number of provisions of the Insurance Code, it does not incorporate Article 17 generally nor § 59A-17-3 specifically. See id. § 59A-30-14.

Company, Lawyers Title Insurance Corporation, and Transnation Title Insurance Company are subsidiaries of LandAmerica Financial Group.

74. In 2004, unidentified persons or entities affiliated with the defendant insurance companies contributed at least $26,200 to Con Alma. The exact identity of these contributors is not currently known to plaintiffs, because Con Alma's contributions report identifies them only as "Title Insurance Industry of NM."

75. A primary purpose of these contributions was to influence defendant Serna, in his capacity as Superintendent of Insurance, to set unreasonably high rates for title insurance, and to restrain competition as to the price and terms of title insurance in New Mexico.

76. Using improper means and methods, defendant title insurance companies have conspired among themselves and with defendant Serna to violate the laws of New Mexico as set forth herein.

(Aplt. App. at 529-30, ¶¶ 72-76.)

Because this matter comes to us on the district court's ruling on Defendants' motions to dismiss the complaints, we must accept these allegations as true. See Bixler, 596 F.3d at 756. Even so, the "filed rate" doctrine still barred Plaintiffs' claims against the Insurer Defendants for damages. Although New Mexico courts have not yet addressed the question, courts in numerous other jurisdictions have reached the same conclusion in similar or at least analogous situations. See H.J. Inc. v. Nw. Bell Tel. Co., 954 F.2d 485, 486, 488-92 (8th Cir. 1992) (holding the "filed rate" doctrine barred claims brought by purchasers of telephone services alleging Northwestern Bell had bribed the Minnesota Public Utilities Commission ("PUC") in order to influence the telephone rates

16

the PUC set in Minnesota).[10]  Under this authority, "the underlying conduct does not

control whether the filed rate doctrine applies.  Rather, the focus for determining whether

[10] See also Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 410, 412-17, 424 (1986) (applying "filed rate" doctrine to preclude antitrust claims alleging motor carriers conspired to file excessive rates with the Interstate Commerce Commission, which, upon filing, became the legal rate; relying on Keogh v. Chi. & Nw. Ry. Co., 260 U.S. 156 (1922)); Crumley v. Time Warner Cable, Inc., 556 F.3d 879, 880-81 (8th Cir. 2009) (per curiam) (applying H.J. Inc. and holding "filed rate" doctrine barred claim alleging cable company fraudulently recovered double fees as part of rate filed with and approved by local regulating authority; noting that the "filed rate" doctrine applies regardless of the fact that the "claim involves allegations of fraud"); Wah Chang v. Duke Energy Trading & Mktg., LLC, 507 F.3d 1222, 1224-27 (9th Cir. 2007) (applying "filed rate" doctrine to bar claim alleging rate approved by agency was too high because applicant fraudulently manipulated the market, skewing the rate approval process); AT&T Corp. v. JMC Telecom, LLC, 470 F.3d 525, 535 (3d Cir. 2006) ("[T]here is no fraud exception to the filed rate doctrine."); Transmission Agency of N. Cal. v. Sierra Pac. Power Co., 295 F.3d 918, 932-33 (9th Cir. 2002) (applying H.J. Inc. to conclude that, under the circumstances of that case, the "filed rate" doctrine precluded claims alleging fraud before an administrative agency because "[t]he impact of any award of damages . . . would be to undermine [the regulatory agency's] ability to regulate rates"); Hill v. BellSouth Telecomms., Inc., 364 F.3d 1308, 1311-13, 1315-17 (11th Cir. 2004) (applying "filed rate" doctrine to bar state-law fraud claims that implicate approved rate); Marcus v. AT&T Corp., 138 F.3d 46, 58-59 (2d Cir. 1998) ("Application of the filed rate doctrine in any particular case is not determined by the culpability of the defendant's conduct or the possibility of inequitable results.") (citing cases); Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17, 18, 20-22 (2d Cir. 1994) (holding there is no exception to the "filed rate" doctrine for a claim alleging that the approved rate is the result of fraud perpetrated on the regulatory agency; noting "every court that has considered the [question] has rejected the notion that there is a fraud exception to the filed rate doctrine") (citing cases); Taffet v. S. Co., 967 F.2d 1483, 1485, 1487-90, 1494-95 (11th Cir. 1992) (reh'g en banc) (relying on "filed rate" doctrine to preclude civil claim, asserted under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), alleging utilities obtained rate increase through fraud perpetrated on regulating agency; noting that "[a] regulated entity's alleged fraud does not create a right to a reasonable rate that exists independently of agency action"); Centerpoint Energy, Inc. v. Miller Cnty. Circuit Ct., 258 S.W.3d 336, 342-43 (Ark. 2007) (noting Arkansas law has adopted Eighth Circuit's reasoning in H.J. Inc. "that the underlying alleged fraudulent conduct of the defendants did not control whether the fixed-rate doctrine applies");

17

the filed rate doctrine applies is the impact the court's decision will have on agency

Gallivan v. AT&T Corp., 21 Cal. Rptr. 3d 898, 905-06 (Cal. Ct. App. 2004) (applying reasoning of H.J. Inc., among others, to hold "filed rate" doctrine barred damages claim alleging fraud); Amundson & Assocs. Art Studio, Ltd. v. Nat'l Council on Comp. Ins., Inc., 988 P.2d 1208, 1211-17 (Kan. Ct. App. 1999) (holding "filed rate" doctrine barred claims that workers' compensation insurers conspired to control insurance rates); Commonwealth ex rel. Chandler v. Anthem Ins. Cos., 8 S.W.3d 48, 50, 53 (Ky. Ct. App. 1999) (holding there was no fraud exception to "filed rate" doctrine that would save claims that insurers "had engaged in a fraudulent scheme to charge Kentucky consumers of health insurance inflated premium rates"); Bauer v. Sw. Bell Tel. Co., 958 S.W.2d 568, 570-71 (Mo. Ct. App. 1997) (holding "filed rate" doctrine barred claim alleging fraud; noting that "[c]ourts that have considered the fraud issue almost unanimously have rejected the notion that there is a fraud exception to the filed rate doctrine") (internal quotation marks omitted); Guglielmo v. WorldCom, Inc., 808 A.2d 65, 67, 69-72 (N.H. 2002) (applying "filed rate" doctrine to bar claims alleging telecommunications companies conspired with prisons to violate state antitrust and consumer protection laws to set excessive rates for collect calls to inmates); Weinberg v. Sprint Corp., 801 A.2d 281, 243-44 (N.J. 2002) (holding "filed rate" doctrine bars claim for money damages, asserted against telecommunications carriers, premised on "consumer fraud[] or other bases on which plaintiffs seek to enforce a rate other than the filed rate"); Porr v. NYNEX Corp., 660 N.Y.S.2d 440, 442, 445-46 (N.Y. App. Div. 1997) (noting "there is no general 'fraud exception' to the filed rate doctrine," citing cases; further holding that "a consumer's claim, however disguised, seeking relief for an injury allegedly caused by the payment of a rate on file with a regulatory commission, is viewed as an attack upon the rate approved by the regulatory commission. All such claims are barred by the 'filed rate' doctrine."); Minihane v. Weissman, 640 N.Y.S.2d 102, 102-03 (N.Y. App. Div. 1996) (holding "filed rate" doctrine barred claim alleging that insurers submitted false and misleading information to superintendant of insurance, thus fraudulently obtaining the filed rate); N.C. Steel, Inc. v. Nat'l Council on Comp. Ins., 496 S.E.2d 369, 371-75 (N.C. 1998) (holding "filed rate" doctrine barred claim that workers' compensation insurers withheld evidence from insurance commissioner that caused him to approve an excessive rate, as well as claim that insurers conspired to affect premium rates); Prentice v. Title Ins. Co. of Minn., 500 N.W.2d 658, 659-60, 662 (Wis. 1993) (applying "filed rate" doctrine to bar claim alleging insurance companies, which were required to file a rate with the state's insurance commissioner, agreed to fix prices of title insurance and related services). But see Cellular Plus, Inc. v. Superior Ct., 18 Cal. Rptr. 2d 308, 317-19 (Cal. Ct. App. 1993) (holding that, under California law, "filed rate" doctrine would not preclude suit for damages by person injured by reason of a price fixing conspiracy even if the fixed prices had been approved by the relevant regulatory agency).

18

procedures and rate determinations." Id. at 489.  The dispositive question, then, is whether, if plaintiffs succeed on their damages claims, the court's determination will impact the agency's rate determinations.  If so, the "filed rate" doctrine will bar the claim. See Crumley, 556 F.3d at 882.  That is clearly the case here.

Although the New Mexico Supreme Court has not expressly addressed the question, we predict the Court would adopt this line of reasoning, see Wade, 483 F.3d at 665-66, which is consistent with the purposes of the "filed rate" doctrine, to prevent price discrimination and to preserve the role of agencies in approving rates.  See Valdez, 54 P.3d at 75.  And, although the New Mexico Supreme Court has not expressly addressed whether or not there is a fraud exception to the "filed rate" doctrine, the Court applied the "filed rate" doctrine in Valdez under circumstances that are similar to those alleged here. In Valdez, the plaintiffs alleged that telephone service providers had "entered into illegal agreements" with government correctional facilities, whereby the telephone service providers "were granted exclusive rights to provide collect telephone service at a higher rate than rates provided to the public," in return for paying the corrections facilities "a commission . . . calculated on the amount billed to the service provider from collect calls placed by inmates in their facilities."  Id. at 74.  Under those circumstances, notwithstanding the allegation that these agreements were "illegal," the New Mexico Supreme Court applied the "filed rate" doctrine to preclude the plaintiffs' claims seeking damages for the excessive telephone rate that they had to pay.  See id. at 75-76.

19

### 3. Plaintiffs' arguments to the contrary are unavailing

Plaintiffs argue that

> [t]he district court ruled that once New Mexico regulators have decided and filed a rate, no one can challenge it, in any court, on any grounds. This sweeping ruling is so overbroad that it strips consumers of any protection under the New Mexico laws, and ousts the judiciary from any role in scrutinizing regulatory decisions for compliance with statutes and the [New Mexico] Constitution.

(Aplt. Br. at 43 (internal citation omitted).) Plaintiffs' characterization is inaccurate. The "filed rate" doctrine, applied in this case, prevented Plaintiffs from recouping money damages for already-charged excessive or unreasonable rates. The "filed rate" doctrine, however, does not prevent any ratepayer from challenging the reasonableness of those rates through the administrative process established by the Title Insurance Act, which includes an opportunity for judicial review. See N.M. Stat. Ann. §§ 59A-30-4, -6, -8, -9 (adopting procedures in §§ 59A-17-34, -35) (2004). Nor does the "filed rate" doctrine necessarily preclude claims for injunctive relief, at least to the extent those claims do not implicate the reasonableness of the approved rate for title insurance premiums. Cf. Square D, 476 U.S. at 422 & 422 n.28 (recognizing that, while "filed rate" doctrine precluded damages claim under federal antitrust laws, it did not preclude claims for injunctive and declaratory relief); Arsberry v. Illinois, 244 F.3d 558, 562-63 (7th Cir. 2001) (noting that "a conspiracy to file (or not file) particular tariffs is not insulated by the filed-rate doctrine from attack under the antitrust laws or other sources of independent rights, provided only injunctive relief is sought" (internal citations omitted)); Dolan v.

Fid. Nat'l Title Ins. Co., 365 F. App'x 271, 275 (2d Cir. 2010) (unpublished) (noting that "a plaintiff may sue for an injunction designed to put an end to the conspiracy" to set filed rates "so long as that injunction does 'not enjoin operation under established rates'" (quoting Georgia v. Pa. R.R., 324 U.S. 439, 455 (1945))), cert. denied, 131 S. Ct. 261 (2010); Marcus, 138 F.3d at 62-63 (in determining whether "filed rate" doctrine precluded claims for injunctive relief, considering whether requested injunction would implicate either non-discrimination or non-judiciability strand of "filed rate" doctrine).

### 4. Conclusion as to the application of the "filed rate" doctrine

For these reasons, the district court correctly invoked the "filed rate" doctrine to dismiss Plaintiffs' claims for money damages, including their claims seeking restitution, disgorgement of excessive premium amounts, and recovery for unjust enrichment. See Valdez, 54 P.3d at 74-75 (relying on "filed rate" doctrine to preclude claims for "damages, restitution, or imposition of a constructive trust" resulting from rates set by the PRC for telephone calls made by inmates in the state prisons).[11]

---

[11] Relying on City of Las Cruces v. El Paso Electric Co., 904 F. Supp. 1238 (D. N.M. 1995), Plaintiffs assert, contrary to Valdez, that the "filed rate" doctrine cannot preclude their claims for restitution or unjust enrichment. But City of Las Cruces did not address the application of the "filed rate" doctrine, as Valdez did. Further, in declining to dismiss the plaintiff's claim of unjust enrichment in that context, City of Las Cruces specifically held that the City's claim at issue in that case did not implicate the approved rate that the defendant electric company charged its customers, but instead sought to collect a franchise fee the electric company had been paying the City of Las Cruces for the right to use the City's streets, alleys, rights-of-way and other public grounds to provide electricity to its customers in the City. See 904 F. Supp. at 1244, 1246-47.

**B. Plaintiffs lack standing to assert a claim for injunctive or declaratory relief against the Insurer Defendants, alleging that the New Mexico Title Insurance Act violates the New Mexico Constitution**

Plaintiffs allege that New Mexico's Title Insurance Act violates two provisions of the New Mexico Constitution, art. IV, §§ 26, 38.[12] Treating these allegations as claims seeking injunctive and declaratory relief, we conclude Plaintiffs lack standing to assert such claims against the Insurer Defendants.[13]

"Standing under Article III is, of course, a threshold issue in every case before a federal court, and diversity claims are no exception." Hutchinson v. Pfeil, 211 F.3d 515, 523 (10th Cir. 2000) (internal quotation, alteration, emphasis omitted). To establish constitutional standing under Article III, Plaintiffs "must demonstrate three elements: injury in fact, traceability, and redressability." S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation and Enforcement, 620 F.3d 1227, 1233 (2010). Plaintiffs "must have standing to seek each form of relief in each claim." Bronson v. Swensen, 500 F.3d 1099, 1106 (10th Cir. 2007). In addressing standing at the motion-to-dismiss stage

---

[12] New Mexico Constitution, art. IV, § 26 provides:

> The legislature shall not grant to any corporation or person, any rights, franchises, privileges, immunities or exemptions, which shall not, upon the same terms and under like conditions, inure equally to all persons or corporations; no exclusive right, franchise, privilege or immunity shall be granted by the legislature or any municipality in this state.

And Article IV, § 38 provides that "[t]he legislature shall enact laws to prevent trusts, monopolies and combinations in restraint of trade."

[13] To the extent Plaintiffs are instead seeking damages relief on their state constitutional claims, the "filed rate" doctrine would also preclude such relief.

22

of these proceedings, we "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the [Plaintiffs, as] complaining part[ies]." Initiative and Referendum Inst. v. Walker, 450 F.3d 1082, 1089 (10th Cir. 2006) (en banc) (internal quotation marks omitted).  Even so, Plaintiffs have clearly failed to meet the third requirement of constitutional standing, redressability, so we need not spend any time on the first two standing requirements, injury-in-fact and the traceability of the injury to the Defendants.

"[T]he requirement of redressability ensures that the injury can likely be ameliorated by a favorable decision."  S. Utah Wilderness Alliance, 620 F.3d at 1233. "The plaintiff must show that a favorable judgment will relieve a discrete injury, although it need not relieve his or her every injury."  Nova Health Sys. v. Gandy, 416 F.3d 1149, 1158 (10th Cir. 2005) (on reh'g).  Here, Plaintiffs failed to allege that any injury they suffered could be redressed by relief granted on the claims Plaintiffs asserted against the Insurer Defendants.

In challenging the constitutionality of a statute, "[t]he redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce [the] challenged statute."  Bronson, 500 F.3d at 1111 (addressing pre-enforcement challenge to criminal statute).  "[I]t must be the effect of the court's judgment on the defendant that redresses the plaintiff[s'] injury, whether directly or indirectly."  Gandy, 416 F.3d at 1159.  The Court may not "assume that everyone (including those who are not proper parties to an action) will honor the legal rationales that underlie their decrees."  Id.

23

(internal quotation marks omitted).  Thus, in this case, Plaintiffs had to establish that any declaratory judgment entered against the Insurer Defendants would somehow be binding on the State Defendants, who are the ones charged with enforcing the New Mexico Title Act.  Plaintiffs have failed to make such a showing.

For this reason, Plaintiffs failed to establish that they have Article III standing to assert their state constitutional claims for prospective relief against the Insurer Defendants.  Although the district court dismissed these claims, it did so with, rather than without, prejudice.  See Brereton v. Bountiful City Corp., 434 F.3d 1213 (10th Cir. 2006) (holding dismissal for lack of standing should be without prejudice).  We, therefore, remand these claims to the district court with directions to vacate its decision dismissing these claims with prejudice and instead to dismiss them without prejudice for lack of standing.  See Gandy, 416 F.3d at 1152-53, 1160.

## C.  Plaintiffs failed to state a claim under the New Mexico Antitrust Act

Plaintiffs next contend that the Insurer Defendants violated New Mexico's Antitrust Act, N.M. Stat. §§ 57-1-1 through 57-1-19, by both 1) complying with the New Mexico Title Insurance Act and 2) conspiring to bribe Superintendent of Insurance Eric Serna to set excessive premium rates for title insurance.[14]

---

[14] Even if the "filed rate" doctrine precluded Plaintiffs' claims for damages asserted under the New Mexico Antitrust Act, but see Valdez, 54 P.3d at 74-76 (addressing damages claims precluded by "filed rate" doctrine separately from claims asserted under the New Mexico Antitrust Act), the Antitrust Act also provides for injunctive relief, as well as costs and attorneys' fees.  See N.M. Stat. § 57-1-3(A).  The "filed rate" doctrine

24

**1. Compliance with the New Mexico Title Insurance Act did not violate the New Mexico Antitrust Act**

New Mexico's Antitrust Act makes unlawful "[e]very contract, agreement, combination or conspiracy in restraint of trade or commerce, any part of which trade or commerce is within this state."  N.M. Stat. § 57-1-1.  Further, it is "unlawful for any person to monopolize or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, trade or commerce, any part of which trade or commerce is within" New Mexico.  Id. § 57-1-2.  But the Antitrust Act specifically exempts from its coverage action taken in compliance with the law:

> Nothing contained in the Antitrust Act is intended to prohibit actions which are:
>
> > A. clearly and expressly authorized by any state agency or regulatory body acting under a clearly articulated and affirmatively expressed state policy to displace competition with regulation; and
> >
> > B. actively supervised by the state agency or regulatory body which is constitutionally or statutorily granted the authority to supervise such actions when the agency or regulatory body does not have any proprietary interest in the actions.

Id. § 57-1-16.  Therefore, the district court did not err in concluding that § 57-1-16 precluded Plaintiffs' antitrust claims asserted against the Insurer Defendants challenging their compliance with the Title Insurance Act.  See Valdez, 54 P.3d at 76 (holding N.M. Stat. § 57-1-16 precluded an antitrust claim challenging telephone rates charged for

would not necessarily preclude such relief.  Therefore, we need to proceed with the antitrust analysis.

25

collect calls from inmates in state prisons because the PRC approved those rates); see also Gonzales v. Pub. Serv. Comm'n of N. Mex. (In re Elec. Serv. in San Miguel Cnty.), 697 P.2d 948, 951 (N.M. 1985) (noting that N.M. Stat. § 57-1-16 "specifically exempts from the Act arrangements that are approved by a regulatory body acting under statutory authority").

### 2. The Insurer Defendants did not violate the New Mexico Antitrust Act even if they conspired to bribe the superintendent of insurance

Plaintiffs further allege that the Insurer Defendants conspired with each other and with Superintendent of Insurance Eric Serna to bribe him "to set unreasonably high rates for title insurance, and to restrain competition as to the price and terms of title insurance in New Mexico." (Aplt. App. vol. ii at 530, ¶ 75.) Relying on the Noerr-Pennington doctrine,[15] the district court held that, even assuming the truth of these allegations, "such an agreement is insufficient as a matter of law to establish a violation of [New Mexico's] antitrust laws." (Id. at 462-63.) We agree.

The Noerr-Pennington doctrine stems from federal antitrust law and exempts from antitrust liability "the conduct of private individuals in seeking anticompetitive action from the government." City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, 379-80 (1991). The Noerr-Pennington doctrine is a corollary to the principle that, "[g]enerally, a state's anticompetitive actions are immune from civil antitrust laws.

---

[15] See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); United Mine Workers of Am. v. Pennington, 381 U.S. 657 (1965).

26

<u>Parker v. Brown</u>, 317 U.S. 341, 350-52 . . . (1943)."[16] <u>Tal v. Hogan</u>, 453 F.3d 1244, 1258 (10th Cir. 2006) (emphasis added).

In this case, the district court's reliance on the <u>Noerr</u>-<u>Pennington</u> doctrine raises two questions: 1) Would the New Mexico Supreme Court apply a <u>Noerr</u>-<u>Pennington</u> exception to the New Mexico Antitrust Act?  And, 2) if so, would that exception preclude Plaintiffs' claims alleging that the Insurer Defendants conspired to bribe Superintendent Serna?

### a.  The New Mexico Supreme Court, if presented with the question, would adopt the <u>Noerr</u>-<u>Pennington</u> doctrine when applying the state's Antitrust Act

Although the New Mexico Supreme Court has not yet addressed this question, we predict that the state supreme court would adopt reasoning similar to the federal <u>Noerr</u>-<u>Pennington</u> doctrine when applying New Mexico's Antitrust Act.[17]  The New Mexico

---

[16] New Mexico courts have indicated that the federal "state action immunity," which "implicate[s] the relationship between federal and state governments," is not applicable to cases brought under New Mexico's Antitrust Act.  <u>City of Sunland Park v. Macias</u>, 75 P.3d 816, 823-24 (N.M. Ct. App. 2003).  But the New Mexico Antitrust Act similarly exempts the State from its coverage.  <u>See</u> N.M. Stat. § 57-1-1.2 (excepting the State from the Act's definition of "person").

[17] Plaintiffs claim that the New Mexico Supreme Court has already rejected the <u>Noerr</u>-<u>Pennington</u> doctrine in <u>DeVaney v. Thriftway Marketing Corp.</u>, 953 P.2d 277 (N.M. 1997), <u>overruled on other grounds by</u> <u>Durham v. Guest</u>, 204 P.3d 19, 24-26 (N.M. 2009), and <u>Fleetwood Retail Corp. of New Mexico v. LeDoux</u>, 164 P.3d 31, 39-40 (N.M. 2007), and in <u>Summit Properties, Inc. v. Public Service Co. of New Mexico</u>, 118 P.3d at 727-28.  But those cases are inapposite.  In <u>Devaney</u>, the New Mexico Supreme Court mentioned the <u>Noerr</u>-<u>Pennington</u> doctrine, not in the antitrust context, but instead in considering a malicious abuse of process tort claim.  <u>See</u> 953 P.2d at 284 & n.1.  In that context, the New Mexico Supreme Court generally noted, without ruling on the subject, that, because

Antitrust Act is patterned after the federal Sherman Antitrust Act, see Smith Mach. Corp. v. Hesston, Inc., 694 P.2d 501, 505 (N.M. 1985), and the state law specifically mandates that, "[u]nless otherwise provided in the [New Mexico] Antitrust Act, the Antitrust Act shall be construed in harmony with judicial interpretations of the federal antitrust laws. This construction shall be made to achieve uniform application of the state and federal laws prohibiting restraints of trade and monopolistic practices," N.M. Stat. § 57-1-15. See Romero v. Philip Morris Inc., 242 P.3d 280, 289, 291 (N.M. 2010). New Mexico case law, therefore, recognizes "the duty of the courts to ensure that New Mexico antitrust law does not deviate substantially from federal interpretations of antitrust law." Id. Thus, "[i]n the absence of New Mexico decisions directly on point, [the New Mexico Supreme Court] look[s] to federal cases involving allegations of antitrust arrangements under . . . the Sherman Act." Smith, 694 P.2d at 505.

Further, the Noerr-Pennington doctrine is based upon the First Amendment, which applies to New Mexico through the Fourteenth Amendment, see Petersen v. Utah Dep't of Corr., 301 F.3d 1182, 1191 (10th Cir. 2002). And the New Mexico Constitution, art.

of the importance of the First Amendment right to petition courts for redress "and the potential chilling effect of tort liability" on the exercise of that right, some states apply the Noerr-Pennington doctrine to actions for malicious prosecution and abuse of process. Id. at 284 n.1. And in Summit Properties, the New Mexico Court of Appeals noted only that the defendant in that case had failed to raise adequately a defense under Noerr-Pennington. See 118 P.3d at 727-28. These decisions certainly do not suggest that the New Mexico Supreme Court would reject application of the Noerr-Pennington doctrine generally, let alone specifically in the antitrust context presented here, nor do they indicate how the New Mexico Supreme Court would apply Noerr-Pennington in other contexts.

28

II, § 17, similarly protects citizens' right to petition their government.  See Am. Ass'n. of People with Disabilities v. Herrera, 690 F. Supp. 2d 1183, 1224 (D.N.M. 2010) (noting that U.S. Constitution's First Amendment freedoms of speech and association are coextensive with protections provided by New Mexico Constitution, art. II, § 17).

Finally, many other states have adopted and apply the Noerr-Pennington doctrine to state antitrust claims, as well as other state-law claims.[18]  For these reasons, then, we

---

[18] See Ex Parte Simpson, 36 So. 3d 15, 21, 26-28 (Ala. 2009) (applying Noerr-Pennington to state tort causes of action); Gunderson v. Univ. of Alaska, 902 P.2d 323, 324, 326-30 (Alaska 1995) (applying Noerr-Pennington to state-law contract claim); Blank v. Kirwan, 703 P.2d 58, 60-61, 63-69 (Cal. 1985) (applying Noerr-Pennington to California antitrust statute); Zeller v. Consolini, 758 A.2d 376, 378, 380-82 (Conn. App. Ct. 2000) (applying Noerr-Pennington to state-law tort claim for tortious interference with a business relationship); Sandholm v. Kuecker, 942 N.E.2d 544, 562-63 (Ill. App. Ct. 2010) (discussing Illinois courts' application of Noerr-Pennington to some state-law claims), appeal allowed, 943 N.E.2d 1109 (Ill. 2011); Bond v. Cedar Rapids Television Co., 518 N.W.2d 352, 353, 355-56 (Iowa 1994) (applying Noerr-Pennington to state tort claim); Grand Cmtys. Ltd. v. Stepner, 170 S.W.3d 411, 412 (Ky. Ct. App. 2004) (applying Noerr-Pennington to state-law tort claims stemming from zoning decisions); Arim v. Gen. Motors Corp., 520 N.W.2d 695, 699-702 (Mich. Ct. App. 1994) (per curiam) (applying Noerr-Pennington to state-law torts claims); Harrah's Vicksburg Corp. v. Pennebaker, 812 So. 2d 163, 171 (Miss. 2001) (holding Noerr-Pennington applies to state-law antitrust and tort claims alleging restraint of trade, civil conspiracy and tortious interference); Defino v. Civic Ctr. Corp., 780 S.W.2d 665, 666-71 (Mo. Ct. App. 1989) (applying Noerr-Pennington to state antitrust and tort claims); Green Mountain Realty Corp. v. Fifth Estate Tower, LLC, 13 A.3d 123, 126, 128-31 (N.H. 2010) (applying Noerr-Pennington doctrine to claim asserted under New Hampshire's Consumer Protection Act); Structure Bldg. Corp. v. Abella, 873 A.2d 601, 602-03 (N.J. App. Div. 2005) (applying Noerr-Pennington to state-law tort claims); Arts4All Ltd. v. Hancock, 810 N.Y.S.2d 15, 16 (N.Y. App. Div. 2006) (applying Noerr-Pennington to state-law tort claim); Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs., 620 S.E.2d 873, 877, 881 (N.C. Ct. App. 2005) (applying Noerr-Pennington to state antitrust and tort claims); Alves v. Hometown Newspapers, Inc., 857 A.2d 743, 753 (R.I. 2004) (noting Rhode Island Supreme Court has adopted the Noerr-Pennington test and has applied it to common law torts); Black Hills Jewelry Mfg. Co. v. Felco Jewel Indus., 336 N.W.2d 153,

predict that the New Mexico Supreme Court would adopt the Noerr-Pennington doctrine when applying the New Mexico Antitrust Act.

### b. The Noerr-Pennington doctrine precluded Plaintiffs' claims asserted under the New Mexico Antitrust Act, which are premised on allegations that the Defendant Insurers conspired to influence, and bribe, the superintendent of insurance to set an excessive premium rate

The next question we address is whether the Noerr-Pennington doctrine would preclude Plaintiffs' claims that the Insurer Defendants conspired with each other and with Superintendent of Insurance Serna to bribe Serna to set excessively high title insurance premium rates. We conclude that the answer is yes.

In Parker, the Supreme Court held that the federal Sherman Act's proscription of anti-competitive conduct did not apply to government action. See 317 U.S. at 350-52. Later in Noerr, the Court addressed the other side "of the same coin," City of Columbia,

---

159 (S.D. 1983) (applying Noerr-Pennington to state antitrust claims, but holding it did not apply in the particular circumstances of this case); RRR Farms, Ltd. v. Am. Horse Prot. Ass'n, Inc., 957 S.W.2d 121, 126-29 (Tex. App. 1997) (applying Noerr-Pennington to state-law tort claims); Anderson Dev. Co. v. Tobias, 116 P.3d 323, 332-33 (Utah 2005) (noting that Noerr-Pennington applies to state antitrust and tort claims); Titan Am., LLC v. Riverton Inv. Corp., 569 S.E.2d 57, 61-62 (Va. 2002) (applying Noerr-Pennington to state-law claims for conspiracy and business torts); Perrine v. E.I. du Pont de Nemours & Co., 694 S.E.2d 815, 834, 884 n.78 (W.Va. 2010) (noting Noerr-Pennington generally applied to state-law claims, but holding that doctrine did not apply in particular circumstances of this case); see also Astoria Entm't, Inc. v. DeBartolo, 12 So. 3d 956, 964 (La. 2009) (suggesting Noerr-Pennington would apply generally in Louisiana courts, but concluding it did not apply under the circumstances of this particular case); Kellar v. VonHoltum, 568 N.W.2d 186, 192-93 (Minn. Ct. App. 1997) (suggesting Noerr-Pennington might apply, under Minnesota law, beyond antitrust context); Am. Med. Transp. of Wis., Inc. v. Curtis-Universal, Inc., 452 N.W.2d 575, 576, 583-84 (Wis. 1990) (suggesting Noerr-Pennington might apply to state antitrust claims, but it did not apply under particular facts of this case).

499 U.S. at 383, concluding that the Sherman Act also did not proscribe private citizens'

conduct undertaken to influence government action.  See Noerr, 365 U.S. at 135-37.

That is so because the purpose of the Sherman Act is to regulate business, not political

activity.[19]  See id. at 137.  This was true, according to Noerr, even if the conduct by

which citizens attempted to influence governmental regulation was undertaken for the

sole purpose of destroying competition, involved unethical business practices, or was

specifically intended to hurt competitors.  See id. at 138-45.  In fact, Noerr addressed

claims of egregious private conduct, including assertions that a number of railroads

conspired to engage in a publicity campaign against their competitors in the trucking

industry "designed to foster the adoption and retention of laws and law enforcement

practices destructive of the trucking business, to create an atmosphere of distaste for the

truckers among the general public, and to impair the relationships existing between the

truckers and their customers."  Id. at 129-30.  In conducting this publicity campaign, the

truckers alleged that the railroads' "sole motivation" was to "injure . . . and eventually to

destroy" the truckers as competitors.  Id. at 129.  To achieve this goal the railroads

employed the "third-party technique," which involved making the "publicity matter

circulated in the campaign" look like "spontaneously expressed views of independent

persons and civic groups when, in fact, it was largely prepared[,] . . . produced," and paid

---

[19] The second reason the Sherman Act does not proscribe private citizens' efforts to influence government action is because doing so would implicate important First Amendment concerns.  See Noerr, 365 U.S. at 137-38.

31

for by the railroads.  Id. at 130.  The railroads counterclaimed, asserting the truckers had

undertaken the same type of conduct against the railroads.  See id. at 132.

Notwithstanding this deceptive and "unethical" business conduct, the Court held

that the Sherman Act did not apply to proscribe it.  See id. at 140-41.

> Insofar as [the Sherman] Act sets up a code of ethics at all, it is a code that
> condemns trade restraints, not political activity, and . . . a publicity
> campaign to influence governmental action falls clearly into the category of
> political activity.  The proscriptions of the Act, tailored as they are for the
> business world, are not at all appropriate for application in the political
> arena.

Id.  In conclusion, Noerr noted that the "fight" between the railroads and the truckers

"appears to have been conducted along lines normally accepted in our political system,

except to the extent that each group has deliberately deceived the public and public

officials.  And that deception, reprehensible as it is, can be of no consequence so far as

the Sherman Act is concerned."  Id. at 144-5.

Although Noerr addressed private citizens' attempts to influence the legislature,

later cases extended Noerr's reasoning to citizens' attempts to influence other

government bodies or officials, including those in the executive branch and the courts.

See California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972);

Pennington, 381 U.S. at 669-70; Cardtoons, L.C. v. Major League Baseball Players

Ass'n, 208 F.3d 885, 888 n.2 (10th Cir. 2000) (en banc) (citing California Motor Transp.,

404 U.S. 508, and Pennington, 381 U.S. 657).

32

More recently, the Supreme Court, relying on its reasoning in <u>Noerr</u>, held that the

Sherman Act did not proscribe private citizens' conduct undertaken to influence

government action, even if that conduct involved conspiracy or bribery. In <u>City of</u>

<u>Columbia</u>, a jury found that a billboard company conspired with city officials to obtain

legislation that protected the billboard company's monopolization of the billboard market

within the city and that restrained the business of a competitor billboard company. <u>See</u>

499 U.S. at 368-69. Nevertheless, the Supreme Court held that the Sherman Act did not

apply to such conduct, which was undertaken to influence governmental action. <u>See</u> <u>id.</u>

at 384. In reaching this conclusion, the Court first rejected a conspiracy exception to

<u>Parker</u> state-action immunity. <u>See</u> <u>id.</u> at 374-75. "Since it is both inevitable and

desirable that public officials often agree to do what one or another group of private

citizens urges upon them, such an exception would virtually swallow up the <u>Parker</u> rule:

All anticompetitive regulation would be vulnerable to a 'conspiracy' charge." <u>Id.</u> at 375.

The Court applied this same reasoning to reject a conspiracy exception to <u>Noerr</u>

immunity, too:

> The same factors which . . . make it impracticable or beyond the purpose of
> the antitrust laws to identify and invalidate lawmaking that has been
> infected by selfishly motivated agreement with private interests likewise
> make it impracticable or beyond that scope to identify and invalidate
> lobbying that has produced selfishly motivated agreement with public
> officials. It would be unlikely that any effort to influence legislative action
> could succeed unless one or more members of the legislative body became
> . . . co-conspirators in <u>some</u> sense with the private party urging such action.

<u>Id.</u> at 383-84 (internal quotation marks omitted).

33

City of Columbia went further, rejecting exceptions to Parker and Noerr immunity even for conspiracies involving "corruption." See id. at 376-79, 383.

> A conspiracy exception narrowed along such vague lines is similarly impractical. Few governmental actions are immune from the charge that they are "not in the public interest" or in some sense "corrupt." . . . The fact is that virtually all regulation benefits some segments of the society and harms others; and that it is not universally considered contrary to public good if the net economic loss to the losers exceeds the net economic gain to the winners.

Id. at 377.

Notwithstanding this language, Plaintiffs suggest that we carve out a special exclusion to Noerr-Pennington when the corruption involves some ill-defined and open-ended concept of bribery or other acts that might violate state or federal law. That approach would, of course, vitiate Noerr-Pennington almost entirely because there is hardly any lobbying effort that is not open to at least a charge of some illegal dealings when important economic interests are at stake. Indeed that is illustrated in this very case, as Plaintiffs' allegations here of bribery are vague and ambiguous. The Supreme Court in City of Columbia understood that risk and held that corruption—and even bribery explicitly—would not vitiate a claim of Noerr-Pennington immunity. The Court said:

> Such unlawful activity has no necessary relationship to whether the governmental action is in the public interest. A mayor is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid. . . . To use unlawful political influence as the test of legality of state regulation undoubtedly vindicates (in a rather blunt way) principles of good government. But the [antitrust] statute we are construing is not directed to that end. Congress

34

has passed other laws aimed at combating corruption in state and local governments. "Insofar as the Sherman Act sets up a code of ethics at all, it is a code that condemns trade restraints not political activity."

City of Columbia, 499 U.S. at 378-79 (quoting Noerr, 365 U.S. at 140) (internal citations, quotations marks, alterations omitted).

Turning, then, to the specific antitrust claims at issue here, Plaintiffs first alleged that the Insurer Defendants conspired with each other and with Superintendent of Insurance Serna to get Serna to set excessive premium rates for title insurance. Such an antitrust claim, based upon allegations of conspiracy generally, is clearly precluded by Noerr-Pennington. See City of Columbia, 499 U.S. at 374-75, 379-80, 382-84; see also Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 499 (1988); GF Gaming Corp. v. City of Black Hawk, 405 F.3d 876, 883-84 (10th Cir. 2005) (applying City of Columbia and noting that, "[f]or purposes of Noerr-Pennington, there is no distinction between petitioning government officials and conspiring with them").

Plaintiffs went further, however, alleging at least generally that the Insurer Defendants conspired to bribe Superintendent Serna to set excessive premium rates for title insurance. Assuming these allegations to be true, as we must at the motion-to-dismiss stage of these proceedings, see Bixler, 596 F.3d at 756, it is, nevertheless, clear from our preceding discussion that there is no bribery exception to Noerr-Pennington

35

immunity.[20]  See City of Columbus, 499 U.S. at 378-80, 382-84.  In rejecting such an

exception, City of Columbia noted that even

> if the [immunity-]invalidating "conspiracy" is limited to one that involves
> some element of unlawfulness (beyond mere anticompetitive motivation),
> the invalidation would have nothing to do with the policies of the antitrust
> laws.  In Noerr itself, where the private party "deliberately deceived the
> public and public officials" in its successful lobbying campaign, we said
> that "deception, reprehensible as it is, can be of no consequence so far as
> the Sherman Act is concerned."

Id. at 383-84 (internal quotation marks omitted).  "The remedy for such conduct rests

with laws addressed to it and not with courts looking behind sovereign state action at the

behest of antitrust plaintiffs."  Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Mem'l

Hosp., 185 F.3d 154, 162 (3d Cir. 1999); see also City of Columbia, 499 U.S. at 378-79

(addressing state-action immunity); Trigen-Okla. City Energy Corp. v. Okla. Gas & Elec.

Co., 244 F.3d 1220, 1227 (10th Cir. 2001) (noting there is no bribery exception to state-

action immunity); Armstrong Surgical Ctr., 185 F.3d at 162 ("Liability for injuries

caused by . . . state action [that inflicts anticompetitive injuries] is precluded even where

it is alleged that a private party urging the action did so by bribery, deceit or other

wrongful conduct that may have affected the decision making process."); Astoria Entm't,

Inc. v. Edwards, 159 F. Supp. 2d 303, 322-25 (E.D. La. 2001) (holding Noerr-Pennington

precluded antitrust claims alleging "bribery, extortion and corruption"), aff'd, 57

---

[20] There is a "sham" exception to Noerr-Pennington immunity, applicable in "situations
in which persons use the governmental process–as opposed to the outcome of that
process–as an anticompetitive weapon."  City of Columbia, 499 U.S. at 380.  But
Plaintiffs have never invoked that exception in this case.

F. App'x 211 (5th Cir. Jan. 7, 2003) (unpublished); Bayou Fleet, Inc. v. Alexander, 68 F. Supp. 2d 734, 744 n.10 (E.D. La. 1999) (noting there was no conspiracy exception to the Noerr-Pennington doctrine in case where Plaintiff alleged bribery), aff'd, 234 F.3d 852 (5th Cir. 2000); cf. Blank, 703 P.2d at 63-69 (holding, even prior to City of Columbia, that Noerr-Pennington precluded claims under California antitrust law alleging bribery of government officials); Cow Palace, Ltd. v. Associated Milk Producers, Inc., 390 F. Supp. 696, 700-04 (D. Colo. 1975) (holding, again prior to City of Columbia, that allegations of bribery and illegal campaign contributions did not automatically strip defendant of Noerr-Pennington immunity).

In arguing to the contrary, Plaintiffs rely on Astoria Entertainment, Inc. v. DeBartolo, 12 So. 3d 956 (La. 2009), but that case is unhelpful to them and, in fact, supports instead the conclusion we reach here. Astoria Entertainment involved allegations that the defendants bribed a former Louisiana governor to have him influence the state Gaming Commission to grant the defendants, and not others, a license to operate a riverboat casino. 12 So. 3d at 958-59. Plaintiff Astoria Entertainment, which sought, but did not receive, the license that the Gaming Commission awarded to the defendants, first sued the defendants in federal court, alleging both federal and state claims. See id. Most relevant to us, the federal court dismissed the federal antitrust claims based upon Noerr-Pennington immunity, notwithstanding the bribery allegations. See Astoria Entm't, 159 F. Supp. 2d at 322-25. In dismissing those antitrust claims, the federal court held, as we do here, that "alleged bribery, extortion and corruption . . . do not remove a

37

case from the ambit of Parker or Noerr-Pennington." Id. at 322. The federal court then dismissed the pendent state-law claims without prejudice. See id. at 329.

After that, Astoria Entertainment brought those state-law claims in Louisiana state court. In that state-court action, the Louisiana Supreme Court declined to apply Noerr-Pennington immunity to the state-law claims, which were not based on antitrust theories. See Astoria Entm't, 12 So. 3d at 959 n.7, 963-67. The Louisiana Court, therefore, refused to apply Noerr-Pennington immunity outside the antitrust context. See id. at 963-67. But that is not the question presented by this case, where we, like the federal court in Astoria Entertainment, apply Noerr-Pennington only within the antitrust context.[21]

### 3. Conclusion as to Plaintiffs' state antitrust claims

For the foregoing reasons, the district court correctly dismissed Plaintiffs' claims asserted under the New Mexico Antitrust Act against the Insurer Defendants.

## D. Plaintiffs failed to state claims against the Insurer Defendants under the New Mexico Unfair Practices Act

Plaintiffs alleged that the Insurer Defendants violated the New Mexico Unfair Practices Act, N.M. Stat. §§ 57-12-1 through 57-12-26 ("UPA"). That act makes unlawful "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce." N.M. Stat. § 57-12-3. Like the New Mexico

---

[21] The parties do not rely on either the Tenth Circuit's post-City of Columbia decision in Tal, 453 F.3d 1244, or the pre-City of Columbia case of Oberndorf v. City and County of Denver, 900 F.2d 1434 (10th Cir. 1990), abrogated in part by City of Columbia, 499 U.S. 365 (1991). Although those cases include some language that might support Plaintiffs' contrary arguments here, see Tal, 453 F.3d at 1260; Oberndorf, 900 F.2d at 1440, that language is dicta and contrary to the clear "holding" in City of Columbia.

Antitrust Act, however, the UPA does not "apply to actions or transactions <u>expressly</u>

<u>permitted</u> under laws administered by a regulatory body of New Mexico . . . , but all

actions or transactions forbidden by the regulatory body, and about which the regulatory

body remains silent, are subject to the Unfair Practices Act." <u>Id.</u> § 57-12-7 (emphasis

added); <u>see also</u> <u>Qhynh Truong v. Allstate Ins. Co.</u>, 227 P.3d 73, 81-82 (N.M. 2010).

The New Mexico Title Insurance Act "expressly permitted" the practices which

Plaintiffs' challenge here--charging the same premium, offering the same coverage, using

state-mandated forms to sell title insurance, and charging premium rates approved by the

superintendent of insurance. <u>See</u> <u>Valdez</u>, 54 P.3d at 74-76 (holding N.M. Stat. § 57-12-7

precluded claims challenging rates charged for collect calls made by inmates in New

Mexico prisons because the PRC expressly permitted those rates as part of its regulation

of telephone service). The district court, therefore, did not err in dismissing Plaintiffs'

claims asserted against the Insurer Defendants under the Unfair Practices Act.

**E.  Plaintiffs failed to state claims against the Insurer Defendants under the New
Mexico Unfair Insurance Practices Act**

Plaintiffs further alleged that the Insurer Defendants violated the New Mexico

Unfair Insurance Practices Act, N.M. Stat. §§ 59A-16-1 through 59A-16-30 ("UIPA").

"A purpose of this [act] is to regulate trade practices in the insurance business and related

businesses . . . by defining, or providing for determination of, practices in this state which

constitute unfair methods of competition or unfair or deceptive acts or practices so

39

defined or determined." N.M. Stat. § 59A-16-2. Plaintiffs alleged that the Insurer

Defendants violated the UIPA because they

> and their agents have engaged in unfair methods of competition and unfair
> or deceptive acts or practices, in violation of § 59A-[16]-3. They have also
> engaged in coercive conduct in violation of § 59A-16-14. They have
> engaged in illegal rebates and inducements in violation of § 59A-16-15.
> They have violated the provisions of § 59A-16-17, regarding inducements.
> They have given rebates in violation of § 59A-16-18. They have engaged
> in monopolistic practices in violation of § 59A-16-19. They have engaged
> in conduct which violates § 59A-16-25.

(Aplt. App. vol. ii at 529, ¶ 69.) The UIPA, however, applies to title insurance only to

the extent it does not conflict with the New Mexico Title Insurance Act. See N.M. Stat.

§ 59A-30-14(M). In light of that, Plaintiffs cannot state a cause of action under the UIPA

based on allegations that the Insurer Defendants complied with the terms of the Title

Insurance Act. Further, Plaintiffs did not allege facts involving improper rebates or

inducements. The district court, therefore, did not err in dismissing Plaintiffs claims'

asserted against the Insurer Defendants under the UIPA.[22]

**F.  Plaintiffs failed to state claims against the Insurer Defendants under the New
Mexico Price Discrimination Act**

Plaintiffs mention the New Mexico Price Discrimination Act ("PDA"), N.M. Stat.

§§ 57-14-1 through 57-14-9, only in the prayers for relief included in their complaints,

seeking damages under N.M. Stat. § 57-14-8(a). This claim fails as a matter of law

---

[22] In a different vein, Plaintiffs also argue, on appeal, that the Insurer Defendants "acted
as an insurance advisory organization or rating bureau without being licensed, in
violation of the New Mexico Insurance Code." (Aplt. Br. at 58 (citing several provisions
of Article 17 of the New Mexico Insurance Code).) However, because Plaintiffs did not
include such allegations in their complaints, we do not address this theory here.

because "the prayer for relief is no part of the cause of action and . . . the parties are entitled to such relief and to such judgment as the complaint . . . makes out." Daniels v. Thomas, 225 F.2d 795, 797 & n.5 (10th Cir. 1955) (applying federal and Colorado law). Further, Plaintiffs fail to explain on appeal how the allegations in their complaints stated a claim under the PDA.

## G.  Plaintiffs failed to state claims for civil conspiracy

Plaintiffs contend they alleged a claim against the Insurer Defendants under New Mexico common law for civil conspiracy.  To the extent Plaintiffs did so, and to the extent such a claim could survive application of the "filed rate" doctrine, Plaintiffs have failed to state such a claim upon which relief can be granted.  To state such a claim, Plaintiffs must allege: "(1) that a conspiracy between two or more individuals existed; (2) that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) that the plaintiff[s] [were] damaged as a result of such acts."  Seeds v. Lucero, 113 P.3d 859, 863 (N.M. Ct. App. 2005) (internal quotation marks omitted). "Unlike a conspiracy in the criminal context, a civil conspiracy by itself is not actionable, nor does it provide an independent basis for liability unless a civil action in damages would lie against one of the conspirators."  Id. at 864 (internal quotation marks omitted); see also Armijo v. Nat'l Sur. Corp., 268 P.2d 339, 346 (N.M. 1954).  Because Plaintiffs have failed to state any claim for damages against the Insurer Defendants, they have also failed to state a claim against them for civil conspiracy.

41

## V.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's decision to dismiss Plaintiffs' claims asserted against the Insurer Defendants, but we REMAND Plaintiffs' state constitutional claims asserted against those Defendants to the district court with directions to dismiss those claims without prejudice for lack of standing.